**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com
*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MATTHIAS SCHARF, DERIVATIVELY AND ON BEHALF OF CEMTREX, INC., <br><br> Plaintiff, <br><br> v. <br><br> SAAGAR GOVIL, ARON GOVIL, RENATO DELA RAMA, RAJU PANJWANI, SUNNY PATEL, and SHAMIK SHAH, <br><br> Defendants, <br><br> and <br><br> CEMTREX, INC., <br><br> Nominal Defendant. | Case No.: <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:** <br><br> **(1) VIOLATIONS OF SECTIONS 14(a), 10(b), AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934;** <br> **(2) BREACH OF FIDUCIARY DUTY;** <br> **(3) UNJUST ENRICHMENT;** <br> **(4) WASTE OF CORPORATE ASSETS;** <br> **(5) ABUSE OF CONTROL; AND** <br> **(6) GROSS MISMANAGEMENT** <br><br><br> **JURY TRIAL DEMANDED** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Matthias Scharf ("Plaintiff"), by his undersigned attorneys, derivatively on behalf of Nominal Defendant Cemtrex, Inc. ("Cemtrex" or the "Company"), files this Shareholder Derivative Complaint against Defendants Saagar Govil ("S. Govil"), Aron Govil ("A. Govil"),

Renato Dela Rama ("Dela Rama"), Raju Panjwani ("Panjwani"), Sunny Patel ("Patel"), and Shamik Shah ("Shah") (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of Cemtrex, unjust enrichment, waste of corporate assets, abuse of control, gross mismanagement, and violations of Sections 14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  As for his complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Cemtrex, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Cemtrex's directors and officers between December 26, 2012 and the present (the "Relevant Period").

2.      Cemtrex is a technology company that offers a range of products, systems and services to its customers, including electronic manufacturing services, instruments for industrial processes, and industrial environmental control systems.

3.     Beginning at in at least October 2015, Cemtrex retained notorious stock-promotion firms, particularly Small Cap Specialists LLC ("SCS") and its subsidiaries, to pump up the Company's stock price.  As part of the scheme, the Company wasted corporate assets to pay stock promotion firms through Southern Steel & Construction Inc. ("Southern Steel"), an undisclosed and now inactive entity owned by the Company's Executive Director, Defendant Aron Govil.  The purpose of stock promotion scheme was to publish and disseminate multiple supposedly independent articles to recommend investments in Cemtrex and ultimately raise the price of Cemtrex stock.

4.     During the Relevant Period, the Company also employed an India-based accounting firm with a history of fraud called Bharat Parikh & Associates ("Bharat Parikh") to conduct its financial audits.  The Individual Defendants breached their fiduciary duties by failing to maintain proper internal controls, including the failure to use a proper auditor.

5.     On February 22, 2017, *Seeking Alpha* published an article by Richard Pearson titled: "Cemtrex: Documents And Photos, All Signs Point To Deception And Failure" (the "Pearson Exposé").  The Pearson Exposé outlined, *inter alia*, Cemtrex and the Individual Defendants' involvement in a scheme to make hidden payments to stock promoters, engage in lucrative insider sales, and to fail to make legally required disclosures.  Additionally, it highlighted issues concerning the Company's use of Bharat Parikh as its auditor.

6.     Also on February 22, 2017, an author by the name of "Unemon1" published two separate posts concerning Cemtrex to his blog on *Seeking Alpha* (the "Unemon1 Blog Posts"): one titled "Is India the new China for Stock Scams? Cemtrex Inc. Warrants a SEC Investigation and Delisting, CETX Lied About Ownershp [sic] in its Filings," and another titled "CETX is an Over-

Leveraged Companies [sic] that Acquired Poorly Performing Businesses by Ramping up Debt. The ROB Cemtrex GmbH Case."

7.     The former article noted discrepancies in Cemtrex's SEC filings concerning its ownership of a company called Cemtrex India Private Ltd. ("Cemtrex India") and documents Cemtrex India filed with the Indian regulator indicating that it was not a wholly-owned subsidiary of Cemtrex, but instead that Defendant A. Govil was its primary stockholder.  The latter article highlighted Cemtrex's use of related-party debt to finance the Company's various acquisitions and also highlighted various incongruities between financial statements filed with German regulators by German subsidiaries of the Company and representations made to the SEC.

8.     On these pieces of news, the price of Cemtrex common stock fell $1.72 per share, or 33.6%, from $5.12 per share on February 21, 2017 to close at $3.40 per share on February 22, 2017.

9.     The Individual Defendants breached their fiduciary duties by having knowingly retained these stock promotion firms, which caused various promotional materials to be disseminated that contained false and misleading statements and omissions of material fact and were written at the behest of the Company for the purpose of promoting the Company and driving up its stock price, and did not disclose information required to be disclosed under federal law.  The Company also failed to disclose in its SEC filings that it indirectly paid for these promotions, also in violation of federal law.

10.     In breach of their fiduciary duties owed to Cemtrex, the Individual Defendants: (1) engaged in a scheme to manipulate the price and trading volume of Cemtrex's stock by paying stock promoters to disseminate false and misleading articles and promotions concerning the

Company; (2) caused the Company to conceal that the Company paid stock promoters through an undisclosed entity owned by A. Govil; (3) caused Cemtrex to falsely state the stock ownership totals of its insiders in the Company's SEC filings; (4) exchanged debt instruments for additional Cemtrex securities, further entrenching Defendant A. Govil's control over the Company; (5) caused the Company to claim to own an Indian subsidiary that it did not actually have ownership of; (6) caused the Company to tout the financial outlook for the automotive electronics sector and Cemtrex's opportunity to capitalize on the expected growth in that sector, despite Cemtrex's poor performance in that sector, which led to a decision to shut down a recently acquired automotive electronics manufacturing plant in Germany; (7) caused the Company to fail to maintain adequate internal controls by, *inter alia*, using a fraudulent Company auditor that was signing off on the Company's financial disclosures without conducting a proper review; and (8) made and/or caused the Company to make false and misleading statements and omissions of material fact regarding the above schemes and the Company's lack of adequate internal and financial controls.

11.     Moreover, in breach of their fiduciary duties: (1) Defendants A. Govil, S. Govil, and Dela Rama engaged in lucrative undisclosed insider sales; (2) Defendants A. Govil, S. Govil, Dela Rama, Panjwani, Patel, and Shah failed to meet mandatory reporting requirements under Section 16(a) of the Exchange Act; and (3) the Individual Defendants made false and misleading statements regarding such conduct.

12.     The Individual Defendants further breached their fiduciary duties by causing the Company to repurchase its own stock while the price of the Company's stock was artificially inflated due to the schemes discussed herein.

13.     The Individual Defendants also failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact referenced, rendering them personally liable to the Company for breaching their fiduciary duties.

14.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, the Company's Chief Executive Officer ("CEO") and Chairman, Vice President of Finance, and Executive Director to a consolidated federal securities fraud class action lawsuit pending in this Court (the "Securities Class Action"), the need to undertake internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, and will likely cost the Company going forward millions of dollars.

15.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

16.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, and all of whom are dominated by the controlling shareholders and/or who are the controlling shareholders, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of certain of them in the Securities Class Action, and of their not being disinterested or independent directors, a majority of the Company's board of directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

17.     Diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and the Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

18.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Plaintiff's claims raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of New York or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

21.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District. Additionally, venue is proper in this District because Cemtrex is located in this District.

22.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

## PARTIES

### Plaintiff

23.     Plaintiff is a current shareholder of Cemtrex common stock. Plaintiff has continuously held Cemtrex common stock at all relevant times.  Plaintiff is a citizen of Germany.

### Nominal Defendant Cemtrex

24.     Nominal Defendant Cemtrex is a Delaware corporation with its principal executive offices at 19 Engineers Lane, Farmingdale, New York 11735.

25.     Cemtrex stock trades on the NASDAQ under the ticker symbol "CETX."

### Defendant S. Govil

26.     Defendant Saagar Govil has served as the Company's President and Chief Executive Officer since December 2011.  He has also served as Chairman of the Board since June 2014.  According to the Company's Schedule 14A filed with the SEC on January 30, 2017 (the "2017 Proxy Statement"), as of January 13, 2017, Defendant S. Govil beneficially owned 1,433,334 shares of the Company's common stock, which was about 14% of the Company's issued and outstanding common stock and 7.1% of the Company's voting stock.  Given that the price per share of the Company's common stock at the close of trading on January 13, 2017 was $6.57, S. Govil owned over $9.4 million worth of Cemtrex stock.

27.     For the fiscal year ended December 31, 2016, Defendant S. Govil received $490,000 in compensation from the Company.  This included $150,000 in base salary and $340,000 in option awards.

28.     The Company's 2017 Proxy Statement stated the following about Defendant S. Govil:

> Saagar Govil is the Company's Chairman since June 2014, and the Chief Executive Officer and President since December 2011. He has been working at Cemtrex since 2008, initially as a field engineer, subsequently moving into sales and management roles as Vice President of Operations. Saagar was recently recognized as a Forbes' 30 Under 30 in 2016, Business Insiders #17 on Top 100 of Silicon Alley in 2015, and Top 40 Under 40 by Stony Brook University in 2014. Saagar Govil has a B.E. in Materials Engineering from Stony Brook University, N.Y. Saagar Govil is the son of Arun Govil. Mr. Govil's experience and deep understanding of the operations of the Company allow him to make valuable contributions to the Board.

29.     According to the Pearson Exposé, during the period of time when the Company materially misstated information, Defendant S. Govil engaged in undisclosed insider sales:

> As we will see, Saagar Govil's share holdings increased by 100,000 during 2016. But during the year, he also awarded himself 400,000 new shares via option grants, such that his position should have increased by 400,000. So clearly his net position actually declined by 300,000 shares.

> For Saagar Govil, the 300,000 decline amounts to up to $2.1 million in 2016 assuming the sale of stock at share prices up to $7.00.

30.     Upon information and belief, Defendant S. Govil is a citizen of New York.

**Defendant A. Govil**

31.     Defendant A. Govil, the father of Defendant S. Govil, has served as a Company director since December 2004 and currently serves as the Executive Director. According to the Company's 2017 Proxy Statement, as of January 13, 2017, Defendant A. Govil beneficially owned 3,182,951 shares of the Company's common stock, which was about 32% of the Company's issued and outstanding common stock and represented 15.8% of the Company's voting stock. Additionally, through a related-party transaction detailed below, he also owned 1,000,000 shares of preferred stock, which represented 50.2% of the Company's voting stock. Thus, in total,

Defendant A. Govil owned 66% of the Company's total voting shares.  Given that the price per share of the Company's common stock at the close of trading on January 13, 2017 was $6.57, A. Govil owned over $20.9 million worth of Cemtrex stock.

32.     The Company's 2017 Proxy Statement stated the following about Defendant A. Govil:

> Aron Govil is the Executive Director and has been with the Company since December 2004. In June 2014, Mr. Govil resigned as Chairman of the Company to devote more time to ventures outside of Cemtrex. Mr. Govil is also President (and owner) of Ducon Technologies Inc., a privately held company engaged in energy and environmental control systems business since 1996. Prior to 1996, Mr. Govil worked at various management and technical positions in the environmental industry. Mr. Govil holds a B.E. degree in Chemical Engineering and a M.B.A. in Finance. He is also a licensed Professional Engineer in New York State and New Jersey. Mr. Govil's experience and deep understanding of the operations of the Company allow him to make valuable contributions to the Board.

33.     According to the Pearson Exposé, during the period of time when the Company materially misstated information, Defendant A. Govil engaged in undisclosed insider sales.  The Pearson Exposé stated that Defendant A. Govil engaged in insider sales of 222,049 shares of Company stock from February 8, 2016 to January 13, 2017 for up to $1.8 million, depending on when the stock was sold.

34.     On September 8, 2009 the Company entered into a transaction with Defendant A. Govil where the Company issued him Series A Preferred Stock.  In the 2017 Proxy Statement, the related-party transaction was described as follows:

> The Series A Preferred Stock was issued by the Company to Aron Govil, the Company's Executive Director, in conjunction with the settlement of the debenture issued as consideration for the purchase of Griffin Filters, Inc. in 2009. Pursuant to the Certificate of Designation of the Series A Preferred Stock, each issued and outstanding share of Series A Preferred Stock is entitled to the number of votes equal to the result of: (i) the number of shares of Common Stock issued and outstanding at the time of such vote multiplied by 1.01; divided by (ii) the total number of Series A Preferred Stock issued and outstanding at the time of such vote, at each meeting of shareholders of the Company with respect to

any and all matters presented to the shareholders of the Company for their action or consideration, including the election of directors. The shares of Series A Preferred Stock held by Aron Govil represent 100% of the total Series A Preferred Stock issued and outstanding.

35.     This related-party transaction between A. Govil and the Company awarded him with 50.2% of the Company's voting stock, giving him a grand total of 66% of the Company's total voting stock.

36.     Defendant A. Govil is also the owner, President, and Executive Director of Ducon Technologies, Inc. ("Ducon").  Ducon engaged in a related-party transaction with the Company where Cemtrex has notes payable to Ducon, totaling $119,055 and $1,869,791 as of September 30, 2015 and September 30, 2014 respectively.  Additionally, the Company's current principal offices are leased from Ducon.

37.     Upon information and belief, Defendant A. Govil is a citizen of New York.

**Defendant Dela Rama**

38.     Defendant Renato Dela Rama has served as the Company's Vice President of Finance since December 2004.  According to the Company's 2017 Proxy Statement, as of January 13, 2017, Defendant Dela Rama beneficially owned 46,834 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on January 13, 2017 was $6.57, Dela Rama owned over $307,699 worth of Cemtrex stock.

39.     For the fiscal year ended December 31, 2016, Defendant Dela Rama received $40,000 in compensation from the Company, consisting solely of base salary.

40.     The Company's 2017 Proxy Statement stated the following about Defendant Dela Rama:

Renato Dela Rama has been our Vice President of Finance since December 2004. Mr. Dela Rama also works as an accountant for Ducon Technologies Inc. since 2004. Prior to that,

he worked in various accounting and financial management positions. Mr. Dela Rama holds a B.S. degree in accounting.

41.     According to the Pearson Exposé, during the period of time when the Company materially misstated information, Defendant Dela Rama engaged in undisclosed insider sales in conjunction with Defendants S. Govil and A Govil.  The Pearson Exposé stated that Defendant Dela Rama's shares have decreased significantly, and that "[t]he total decrease [in Defendants Dela Rama, S. Govil, and A. Govil's] shares amounts to nearly 1 million shares, amounting to as much as $7 million in proceeds in 2016."

42.     Defendant Dela Rama has worked as an accountant for Ducon since 2004.  In the fiscal years ended September 30, 2015 and 2016, Defendant Dela Rama received compensation of $60,000 for each fiscal year from Ducon.

43.     Upon information and belief, Defendant Dela Rama is a citizen of New York.

**Defendant Panjwani**

44.     Defendant Raju Panjwani has served as a Company director since April 2015.  He also serves as a member of the Audit Committee.

45.     The Company's 2017 Proxy Statement stated the following about Defendant Panjwani:

Raju Panjwani was appointed to the Board on April 22, 2015. He is an accomplished executive with over 35 years of experience, including 20 years on Wall Street, and 20 years as an entrepreneur and business builder. Raju was a Managing Director with Morgan Stanley, where he spent 18 years in several senior roles in risk management, audit, strategy and being the Chief Operating Officer and Country Head for the Firm's India office. Since leaving Morgan Stanley in 2005, Mr. Panjwani has considerable experience in emerging Asian markets, with a reputation built on focused execution, high integrity and strong relationships. He has worked with many companies in the United States and India and negotiated complex joint ventures, mergers & acquisitions, and capital raises, particularly within the technology sector. Mr. Panjwani is a CPA in New York State and spent several years with Price Waterhouse and other accounting firms prior to joining Morgan Stanley.

Mr. Panjwani's accounting background and extensive knowledge of finance and commerce allow him to make valuable contributions to the Board.

46.     Upon information and belief, Defendant Panjwani is a citizen of New York.

**Defendant Patel**

47.     Defendant Sunny Patel has served as a Company director since April 2015.  He also serves as Chair of the Audit Committee.

48.     According to the Company's 2017 Proxy Statement, as of January 13, 2017, Defendant Patel beneficially owned 6,722 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on January 13, 2017 was $6.57, Patel owned over $44,163 worth of Cemtrex stock. Notably, Defendant Patel did not file a Form 3 to indicate his initial stock ownership. Only after the truth was exposed did Patel file the required Form 3 on March 7, 2017.

49.     The Company's 2017 Proxy Statement stated the following about Defendant Patel:

Sunny Patel was appointed to the Board on April 22, 2015 and presently serves as a manager for Three Point Capital, a premier specialty finance company. He has vast experience in loan origination and creative financing vehicles for growth companies and project financing. Before joining Three Point in 2010, Mr. Patel was an equity derivatives trader at Group 1 Trading for several years. Mr. Patel is an activist investor who focuses on emerging growth companies with strong fundamentals. Mr. Patel a is CFA Level 3 candidate and graduated Cum Laude from New York University's Stern School of Business. Mr. Patel's extensive knowledge of finance allows him to make valuable contributions to the Board.

50.     Upon information and belief, Defendant Patel is a citizen of New York.

**Defendant Shah**

51.     Defendant Shamik Shah served as a Company director from May 2015 to February 2018.  He also served as a member of the Audit Committee.  According to the Company's 2017 Proxy Statement, as of January 13, 2017, Defendant Shah beneficially owned 5,417 shares of the

Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on January 13, 2017 was $6.57, Shah owned over $35,589 worth of Cemtrex stock. Notably, Defendant Shah did not file a Form 3 to indicate his initial stock ownership. Shah filed the required Form 3 on March 7, 2017, after the truth was exposed.

52.     The Company's 2017 Proxy Statement stated the following about Defendant Shah:

Shamik Shah was appointed to the Board on May 12, 2015 and is currently a Derivatives Trader with Chicago Trading Company ("CTC"), specializing in Natural Gas futures and options. He has vast experience in various trading strategies, energy markets, electronic trading, and market making. Prior to working with CTC, he worked for a fund of funds at Rothschild providing analytics, research, and due diligence in hedge funds across multiple strategies. Mr. Shah studied Finance and International Business at New York University's Stern School of Business. Mr. Shah's extensive knowledge of finance allows him to make valuable contributions to the Board.

53.     Upon information and belief, Defendant Shah is a citizen of Illinois.

**<u>FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS</u>**

54.     By reason of their positions as officers and/or directors of Cemtrex and because of their ability to control the business and corporate affairs of Cemtrex, the Individual Defendants owed Cemtrex and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Cemtrex in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Cemtrex and its shareholders so as to benefit all shareholders equally.

55.     Each director and officer of the Company owes to Cemtrex and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

56. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Cemtrex, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

57. To discharge their duties, the officers and directors of Cemtrex were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

58. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Cemtrex, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Cemtrex's Board at all relevant times.

59. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities Exchange Act of 1934 ("Exchange Act") and traded on the NASDAQ, the Individual Defendants had a duty not to effect and to prevent the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business,

products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the paid stock promotion and artificial inflation of the Company's stock, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those events described in this Complaint that it failed to disclose, and refrain from hiring promotion firms who knowingly caused false and misleading promotional materials to be disseminated on behalf of the Company or omitted required disclosures, so that the market price of the Company's common stock would be based upon truthful and accurate information.

60.     To discharge their duties, the officers and directors of Cemtrex were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Cemtrex were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New York, the United States, and pursuant to Cemtrex's own Corporate Code of Business Ethics and internal guidelines;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Cemtrex conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Cemtrex and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Cemtrex's operations would comply with all laws and Cemtrex's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

61.     Each of the Individual Defendants further owed to Cemtrex and the shareholders the duty of loyalty requiring that each favor Cemtrex's interest and that of its shareholders over

their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

62.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Cemtrex and were at all times acting within the course and scope of such agency.

63.     Because of their advisory, executive, managerial, and directorial positions with Cemtrex, each of the Individual Defendants had access to adverse, non-public information about the Company.

64.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Cemtrex.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

65.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

66.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act; (ii) to conceal adverse information concerning the Company's operations, financial condition, competitors, future business prospects and internal controls; and (iii) to

artificially inflate the Company's stock price while at least three of the Individual Defendants engaged in lucrative insider sales.

67.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully, recklessly, or negligently to engage in a corrupt and undisclosed stock promotion scheme, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of Cemtrex was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

68.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

69.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Cemtrex, and was at all times acting within the course and scope of such agency.

## CORPORATE CODE OF BUSINESS ETHICS

70.     The Company's Corporate Code of Business Ethics (the "Code of Ethics") found on the Company's website, www.cemtrex.com, "establishes the standards of conduct to be followed by all employees of the Company."

71.     The Code of Ethics provides, as to "General Policy," that:

It is the policy of the Company to comply with all applicable laws, to act fairly, impartially, and in an ethical, proper manner. The highest standards of conduct are required of our employees and all other persons who act on our behalf, which includes contractors, consultants, etc. It is Company policy that all persons acting on its behalf comply with the legal requirements of the various countries, economies and regional communities in which the company does business. Employees shall conduct the Company's affairs in accordance with the highest moral and legal standards. The reputations of the Company and each employee of the Company for unquestioned honesty, integrity and fair dealing are priceless assets. These are assets that must not be compromised. Therefore, the guidelines set forth in the following areas apply uniformly to all persons representing each member of the entire Cemtrex, Inc. group of companies.

72.     The Code of Ethics provides, as to "Code of Conduct," that:

Cemtrex, Inc. is committed to promoting integrity and maintaining the highest standards of ethical conduct in all of its business activities. Our business success is dependent on trusting relationships, built on this foundation of integrity. Our reputation is founded on the personal integrity of the company personnel and our dedication to:

- Honesty in communicating within the company and with our suppliers and customers, while at the same time protecting the company's confidential information and trade secrets.
- Error free workmanship in our products and services, leading to quality products and services to our customers.
- Responsibility for our words and actions confirms our commitment to do what we say.
- Limitless respect for our fellow employees, shareholders, customers and suppliers while showing willingness to solicit their opinions and value their feedback.
- Earnest and fair dealings with our fellow employees, shareholders, customers and suppliers through adherence to all applicable laws, regulations and policies, and high standards of behavior.
- Yielding to the need for strong relationships with our employees and the communities affected by our businesses.

73.     The Code of Ethics provides, as to "Confidential Information," that:

Cemtrex believes its confidential proprietary information is an important asset in the operation of its business and prohibits the unauthorized use or disclosure of this information. Employees shall not disclose directly or indirectly any confidential information acquired in the course of employment, nor shall employees use such information to further any personal interest or to the Company's disadvantage. This includes trading or providing information to others to permit them to trade insecurities of

- 20 -

the Company or other companies while in possession of material non-public information about those securities.

Cemtrex respects the property rights of other companies to their proprietary information and requires its employees to fully comply with both the spirit and the letter of U.S. and foreign laws and regulations protecting such rights. Cemtrex's success is dependent upon the strict adherence by employees to this portion of the Code and all applicable standards and procedures.

74.     The Code of Ethics provides, as to "Financial Accounting and Reporting," that:

All business records, expense accounts, vouchers, invoices, bills, payroll, service records and other reports, books and records of the Company must be prepared with care and accuracy and maintained in a verifiable manner in conformance with generally accepted accounting principles (GAAP). All entries to Company ledger accounts must be substantiated by documentation that accurately describes the transaction they represent.

All corporate funds and accounts must be established in accordance with applicable Standard Practices. No fund or account is to be established or maintained for a purpose that is not fully and accurately described in the relevant books of the Company. All company books, records, accounts, funds and assets must be maintained to reflect fairly and accurately the underlying transactions and disposition of company business in reasonable detail. No entries will be made that intentionally conceal or disguise the true nature of any company transaction.

In this respect, the following guidelines must be followed:
- No undisclosed, unrecorded, or "off-book" funds or assets should be established for any purpose.
- No false or fictitious invoices should be paid or created. No false or artificial entries should be made or misleading reports issued.
- Assets and liabilities of the company shall be recognized and stated in accordance with the company's standard practices and GAAP.

If an employee believes that the company's books and records are not being maintained in accordance with these requirements, the employee should report the matter directly to their supervisor, or to Mr. Sunny Patel, as Chairman of the Audit Committee for the Board of Directors (see Section entitled "Reporting Violations" for contact information).

75.     The Code of Ethics provides, as to "Insider Trading," that:

Employees shall not trade in securities while in possession of material inside information. To avoid even the appearance of insider trading, employees shall not trade in options in the company's stock and shall avoid speculating in Cemtrex stock. All employees shall follow the guidelines on securities trading issued by the company.

Federal law and company policy prohibits employees, directly or indirectly through their families or others, from purchasing or selling company stock while in possession of material, non-public information concerning the company. To avoid even the appearance of improprieties, company policy also prohibits employees from trading options on the open market in company stock under any circumstances.

Material, non-public information is any information that could reasonably be expected to affect the value of a stock. If an employee is considering buying or selling a stock because of inside information they may possess, they should assume that such information is material. It is also important for the employee to keep in mind that if any trade they make becomes the subject of an investigation by the government, the trade will be viewed after-the-fact with the benefit of hindsight. Consequently, employees should always carefully consider how their trades would look from this perspective.

If an employee's family or friends ask for advice about buying or selling company stock, the employee should not provide it. Federal law and company policy also prohibit the employee from "tipping" family or friends regarding material, non-public information that the employee learns about Cemtrex in the course of employment. The same penalties apply, regardless of whether the employee derives any benefit from the trade.

76.    The Code of Ethics provides, as to "Conflicts of Interest," that:

Each Cemtrex employee must be careful to avoid any situation that might create a personal conflict of interest. This may involve participating in activities, including outside employment, which conflict or appear to conflict with Cemtrex's business. Included are financial interests in suppliers or competitors. Business decisions and actions must be based on the best interests of Cemtrex and must not be motivated by personal considerations or relationships. Relationships with prospective or existing suppliers, contractors, customers, competitors or regulators must not affect our independent and sound judgment.

General guidelines to help employees better understand several of the most common examples of situations that may cause a conflict of interest follow:

- Outside Employment – employees of Cemtrex may not work for or receive payments from any competitor, customer, distributor or supplier of Cemtrex without approval of local management. Any outside activity must be strictly separated from Cemtrex employment and should not harm job performance at Cemtrex.
- Board Memberships – serving on the Board of Directors or a similar body for an outside company or government agency requires the advance approval of local management. Helping the community by serving on boards of non-profit or community organizations is encouraged and does not require prior approval.
- Gifts Given to Cemtrex Employees – employees of Cemtrex may not accept kickbacks, lavish gifts or gratuities. We can accept items of nominal value, such as

small promotional items bearing another company's name. We cannot accept anything that might make it appear that our judgment for Cemtrex would be compromised.

- Gifts Given by Cemtrex Employees – some business situations call for giving gifts. Gifts from Cemtrex must be legal, reasonable and approved by local management.

77.     The Code of Ethics provides, as to "Reporting Violations," that:

There are no easy answers to many ethical issues we face in our daily business activities. In some circumstances, the right thing to do will be obvious, but in other more complex situations, it may be difficult for an employee to decide what to do. When an employee is faced with a tough ethical decision or whenever they have any doubts as to the right thing to do, they should talk to someone else such as their supervisor or another manager. The company also has a member of the Board of Directors who has been identified as the individual to handle reports on violations of company policy. As the Chairman of the Audit Committee for the Board of Directors, Mr. Sunny Patel serves as the individual to whom reported violations of company policy should be made, as well as any suspected misconduct by any employee or representative of the company. This may be done anonymously in writing to: William M. Aul, Esq., c/o Law Offices of William M. Aul, 7676 Hazard Center Drive, Suite 500, San Diego, CA 92108.

Cemtrex, Inc. will not permit any form of retribution against any person, who, in good faith, reports known suspected violations of this Corporate Code of Business Ethics or other company policy.

78.     The Code of Ethics provides, as to "Use of Company Assets," that:

Cemtrex's assets are to be used only for legitimate business purposes of Cemtrex, Inc. and its subsidiaries and only by authorized employees or their designees. This includes tangible and intangible assets. Some examples of tangible assets include office equipment such as phones, copiers, computers, furniture, supplies and production equipment.

We all have a responsibility to protect Cemtrex assets entrusted to us from loss, damage, misuse or theft. Cemtrex assets, such as funds, products or computers, may only be used for business purposes and other purposes approved by management. Cemtrex assets may never be used for illegal purposes.

Cemtrex's electronic mail (e-mail) system should be restricted primarily to company business. Highly confidential information should be handled appropriately. The company reserves the right at any time to monitor and inspect, without notice, all electronic communications data and information transmitted over network and electronic files located on personal computers owned by the company or computers on the premises used in company business.

To the extent permitted under applicable law, employees, contractors and temporary employees shall assign to the company any invention, work of authorship, composition or other form of intellectual property created during the period of employment. Each employee shall execute a Confidentiality Agreement prior to commencing work for Cemtrex.

79.     The Code of Ethics provides, as to "Additional Responsibilities of Managers," that:

Cemtrex managers are expected to lead according to our standards of ethical conduct, in both words and actions.  Managers are responsible for promoting open and honest two-way communications.  Managers must be positive activists and role models to show respect and consideration for each of our employees.  Managers must be diligent in looking for indications that unethical or illegal conduct has occurred.

80.     In violation of the Code of Ethics, the Individual Defendants consciously disregarded their duties to (1) comply with the applicable laws and regulations, (2) make accurate filings with the SEC and other regulatory authorities, (3) not engage in insider trading, (4) avoid conflicts of interest, (5) protect Company assets, and (6) report violations of the Code of Ethics.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

81.     Cemtrex operates through three business segments: (1) Electronics Manufacturing Services ("EMS"); (2) Environmental Products & Systems ("EPS"); and (3) Industrial Products & Services ("IPS").

82.     The Company employs a growth strategy by way of acquisition and has made several acquisitions under this strategy.

83.     During the Relevant Period, in breach of their fiduciary duties, the Individual Defendants (as discussed in further detail herein): (1) engaged in a scheme to manipulate the price and trading volume of Cemtrex's stock by paying stock promoters to disseminate false and misleading articles and promotions concerning the Company; (2) caused the Company to conceal that the Company paid stock promoters through an undisclosed entity owned by A. Govil; (3) caused Cemtrex to falsely state the stock ownership totals of its insiders in the Company's SEC

filings; (4) exchanged debt instruments for additional Cemtrex securities, further entrenching Defendant A. Govil's control over the Company; (5) caused the Company to claim to own an Indian subsidiary that it did not actually have ownership of; (6) caused the Company to tout the financial outlook for the automotive electronics sector and Cemtrex's opportunity to capitalize on the expected growth in that sector, despite Cemtrex's poor performance in that sector, which led to a decision to shut down a recently acquired automotive electronics manufacturing plant in Germany; and (7) caused the Company to fail to maintain adequate internal controls by, *inter alia*, using a fraudulent Company auditor that was signing off on the Company's financial disclosures without conducting a proper review.

84.     Moreover, in breach of their fiduciary duties: (1) Defendants A. Govil, S. Govil, and Dela Rama engaged in lucrative undisclosed insider sales; and (2) Defendants A. Govil, S. Govil, Dela Rama, Panjwani, Patel, and Shah failed to meet mandatory reporting requirements under Section 16(a) of the Exchange Act.

85.     Cemtrex sought to engage in the schemes described herein to avoid any negative impact on the Company's stock price, which would in turn hinder the ability of the Company to make its acquisitions, as such acquisitions were in large part financed through Cemtrex's use of its stock.

86.     Since traditional routes of equity and debt financing were not available to Cemtrex as a result of its ineligibility to conduct an S-3 shelf registration and suspect financial statements, utilizing Company common stock and related-party financing provided by Defendant A. Govil and Ducon was the only practical way that the Company's acquisitions could be funded.

87.     The Company's acquisitions and related-party debt improved the optics of Cemtrex's financial statements, allowing for Defendants A. Govil, S. Govil, and Dela Rama to unjustly enrich themselves while falsely portraying Cemtrex as prospering.

**The Federal Securities Laws on Stock Promotion**

88.     The Individual Defendants' failure to disclose Cemtrex's paid relationships with stock promoters ran afoul of Section 17(b) of the Securities Act of 1933.

89.     Section 17(b) – commonly known as the "anti-touting" provision – provides, in pertinent part, that anyone who advertises a stock, even if he does not purport to offer the security for sale, must disclose the "consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, the receipt, whether past or prospective, of such consideration and the amount thereof."  15 U.S.C. §77q(b).

90.     This anti-touting provision was enacted, in part, to "meet the evils of the 'tipster sheet' as well as articles in newspapers or periodicals that purport to give an unbiased opinion but which opinions in reality are bought and paid for."[1]

91.     In an investor bulletin published by the SEC titled "Microcap Stock: A Guide for Investors," the SEC provides information about investment in microcap stocks and specifically warns of potential fraud, explaining as follows:

> Paid Promoters: Some microcap companies pay stock promoters to recommend or "tout" the microcap stock in supposedly independent and unbiased investment newsletters, research reports, or radio and television shows . . . . The federal securities laws require the publications to disclose who paid them for the promotion, the amount, and the type of payment.  ***But many fraudsters fail to do so and mislead investors into believing they are receiving independent advice.***

---

[1] *SEC v. Wall St. Pub. Inst., Inc.*, 851 F.2d 365, 376 (D.C. Cir. 1988) (quoting House Committee Report, H.R. Rep. No. 85, 73d Cong., 1st Sess. 6 (1933)).

This SEC investor bulletin may be found at http://www.sec.gov/investor/pubs/microcapstock.htm. (Emphasis added.)

92.    Moreover, an issuer of securities is also required to disclose the details of its relationship with a stock promoter in its regulatory filings.  Here, Defendants' failure to disclose the stock promoters' receipt of compensation directly or indirectly from the Company for making material statements concerning Cemtrex is considered a material omission, thus supporting the claims of their concomitant violations of Sections 10(b) and 20(a) of the Exchange Act.  *SEC v. Softpoint, Inc.*, 958 F.Supp. 846, 863 (S.D.N.Y. 1997); *SEC v. Scott*, 565 F.Supp. 1513, 1527 (S.D.N.Y. 1983); *SEC v. Curshen*, 372 F. App'x 872, 881 (10th Cir. 2010) (citing *Basic, Inc. v. Levinson*, 485 U.S. 224, 232 (1988)).

### The Individual Defendants' Stock Promotion Scheme to Defraud

93.    Beginning as early as October 1, 2015, under the direction of the Individual Defendants, the corrupt stock promoters touted Cemtrex stock without disclosing that they were paid to do so by the Company, and in all such cases the Company failed to disclose in its regulatory filings with the SEC that it paid the stock promoters for promoting the Company's stock.

94.    The Pearson Exposé revealed promotions that occurred during the Relevant Period and provided web links to dozens more, each of which failed to disclose that they were paid for by the Company.  These are just the promotions that were discovered and noted in the Pearson Exposé and likely compose merely a fraction of the promotions.  Examples of promotions that contained the foregoing omissions of material fact follow, and more are provided in excerpts from the Pearson Exposé detailed below.

95.    On October 11, 2016, a company named Stocks Impossible (a wholly-owned subsidiary of SCS) sent an email touting Cemtrex to a mailing list of a vast array of U.S. investors

and published the information in the email on its website, www.stocksimpossible.com.  The Stocks

Impossible email stated, in pertinent part:

> Good morning everyone, This week's featured profile is one of our favorite small cap's since our initial coverage in October 2015.
>
> Cemtrex, Inc. (NASDAQ: CETX) CETX has been an amazing growth story through organic and acquisitions since our initial coverage last year. We are excited about what may be in store for this company going forward.
>
> Cemtrex securities have retraced to $4.01 from a high of $6.59/share in August. CETX as mentioned in a shareholder update below has nearly 60% insider ownership and a float of around 4.2M shares according to yahoo finance.
>
> Key Achievements in 2016 to Date • Cemtrex delivered a five-year, 33% revenue CAGR, with revenue reaching nearly $57 million in 2015; • Net sales grew 14.4% in the first six months of FY 2016, after a 20% organic increase in 2015; • Cemtrex anticipates a nearly $60 million revenue contribution from new acquisitions and has made two acquisitions thus far in 2016 and is continuously exploring strategic M&A as well as opportunities to drive organic growth; • The Company is set to deliver over $100 million in total sales over the next 12 months, compared to $47 million generated in all of 2014; • Insider ownership of roughly 60% aligns insider interests with those of public shareholders and supports management's demonstrated commitment to building shareholder value; • Electronics Manufacturing Services (EMS) reflects anticipated growth globally. New Venture Research predicts the EMS industry at $621 billion in 2019, up from $460 billion in 2014, as more companies rely on outsourcing electronics manufacturing; • Industrial Products & Services (IPS) holds solid market opportunities. Cemtrex IPS grew by $14 million in FY 2015, primarily in Southeast Asian markets where robust industrial expansion is occurring; • New markets for Cemtrex's greenhouse gas reduction technology, VAMOX, is supported by growing sponsorship of the Paris climate agreement. Cemtrex is one of only two companies in the world with such technology; and • The Company's board of directors has approved a new share repurchase authorization, under which Cemtrex may repurchase up to one million outstanding shares over the next 12 months, depending on market conditions.
>
> To read the letter to shareholders in full, please visit:http://www.cemtrex.com/investor-relations/letters-to-shareholders Recent news- Worldwide Commitment to Paris Climate Agreement to Open Up New Opportunities for Cemtrex Excerpt- Cemtrex's Chairman and CEO, Saagar Govil, commented, "This global interest to curb climate change is an important step towards stronger domestic and international policy on CO2 reduction. This translates to companies implementing greenhouse gas monitoring technologies as a first step to better assess their carbon footprint and then subsequently technologies for CO2 capture and removal. At Cemtrex, we are positioned well to provide monitoring solutions for many industrial and manufacturing companies currently, and are focused on developing

innovative solutions for a low carbon future. We believe this can open billion dollar markets for our products like IS2500 and VAMOX." Read the full PR- https://finance.yahoo.com/news/worldwide-commitment-paris-climate-agreement-130000457.html Should Cemtrex move back in to its previous trading range from just two months ago we could see 25-50% gains for our members.

A follow-up report/update will be issued soon.

The Team ================================================

DISCLAIMER Stocks Impossible is a wholly owned subsidiary of Small Cap Specialists LLC, herein referred to as SCS LLC.

Our reports/releases are a commercial advertisement and are for general information purposes ONLY. We are engaged in the business of marketing and advertising companies for monetary compensation. Never invest in any stock featured on our site or emails unless you can afford to lose your entire investment. The disclaimer is to be read and fully understood before using our services, joining our site or our email/blog list as well as any social networking platforms we may use.

PLEASE NOTE WELL: SCS LLC and its employees are not a Registered Investment Advisor, Broker Dealer or a member of any association for other research providers in any jurisdiction whatsoever.

Release of Liability: Through use of this website viewing or using you agree to hold SCS LLC, its operator's owners and employees harmless and to completely release them from any and all liability due to any and all loss (monetary or otherwise), damage (monetary or otherwise), or injury (monetary or otherwise) that you may incur. The information contained herein is based on sources which we believe to be reliable but is not guaranteed by us as being accurate and does not purport to be a complete statement or summary of the available data. SCS LLC encourages readers and investors to supplement the information in these reports with independent research and other professional advice. All information on featured companies is provided by the companies profiled, or is available from public sources and SCS LLC makes no representations, warranties or guarantees as to the accuracy or completeness of the disclosure by the profiled companies. None of the materials or advertisements herein constitute offers or solicitations to purchase or sell securities of the companies profiled herein and any decision to invest in any such company or other financial decisions should not be made based upon the information provide herein. Instead SCS LLC strongly urges you conduct a complete and independent investigation of the respective companies and consideration of all pertinent risks. Readers are advised to review SEC periodic reports: Forms 10-Q, 10K, Form 8-K, insider reports, Forms 3, 4, 5 Schedule 13D. SCS LLC is compliant with the Can Spam Act of 2003. SCS LLC does not offer such advice or analysis, and SCS LLC further urges you to consult your own independent tax, business, financial and investment advisors. SCS LLC has been

compensated thirty thousand dollars' cash via bank wire by Southern Steel and Construction, Inc. for two to three days' coverage of CETX. Investing in micro-cap and growth securities is highly speculative and carries and extremely high degree of risk. It is possible that an investor's investment may be lost or impaired due to the speculative nature of the companies profiled.

96.     Although the disclaimer stated that the promotion was paid for by Southern Steel, the promotion failed to disclose that it was actually paid for indirectly by the Company.

97.     On the same day, a company named Small Cap Traders (also a wholly-owned subsidiary of SCS) sent an email touting Cemtrex to a mailing list of a vast array of U.S. investors and published the information in the email on its website, www.smallcaptraders.com.  The Small Cap Traders email stated, in pertinent part:

Good morning traders,

Cemtrex, Inc. (NASDAQ: CETX)

Looking undervalued- Market Cap $38.58 million (less than half of 2016 projected revenue)

Cemtrex is a diversified technology company that provides electronic manufacturing services of printed circuit board assemblies, provides instruments for industrial processes, and provides industrial environmental control systems.

Since its up-listing to the NASDAQ exchange over a year ago CETX has acquired Periscope, a German electronics manufacturing company focused on electronic manufacturing services primarily for the major German automotive manufacturers. Earlier, they had acquired Advanced Industrial Services Inc. (AIS), a well-known broad based industrial services provider. AIS offers one-source expertise and capabilities in plant and equipment erection, relocation, and disassembly.

Through their Monitoring Instruments Products (MIP) division Cemtrex is engaged in the manufacturing, sale and service of advanced instruments, software and systems for monitoring emissions of Greenhouse gases, hazardous gases, particulate and other regulated pollutants used in emissions trading globally.

The recent Paris agreement on climate change will become effective on November 4, 2016 after a coalition of the world's largest polluters pushed it past a key threshold on Wednesday. CETX is in a unique position to provide the needs of the over 60 countries participating in the agreement, including the USA and China. The company believes this

can open billion dollar markets for its products like IS2500 and VAMOX.

IS-2500 Multi Gas Analyzer:

The IS 2500 is designed for on-line analysis of up to five gas phase process components using NDIR technology. The systems utilize a unique in-situ design structure for immense durability and long-term savings.

VAMOX Methane Reduction Technology:

The company claims to be one of two companies with such technology, which they currently sell to the Oil & Gas industry. Each Vamox unit sells for a minimum of $2,000,000 with several thousands of potential sites.

The IS-2500 and Vamox systems are just two of the many products the company offers through its MIP division. CETX may have stepped into a big pile of potential revenue with their current emissions products, but the company's ambition doesn't stop there.

Looking toward the future, Cemtrex is looking beyond monitoring and reducing greenhouse gases. Late in July, the company disclosed a new initiative to set up a research pilot plant for the production of graphene by isolating carbon dioxide from flue gases at its Farmingdale, NY facility.

Simply put, graphene is a single layer of carbon atoms.  A million times thinner than a piece of paper, it's so thin that it is considered to be the first two-dimensional material ever, yet stronger than diamond and more conductive than copper.  Discovered just over a decade ago, graphene is hailed as a super-material with infinite potential applications in electronics, communications, lubricants and much more. What Cemtrex is aiming to accomplish is capturing pollutants and repurposing the carbon into what is arguably the world's most advanced material.

Consider the metrics CETX offers investors as well:

Market Cap $38.58 million (less than half of 2016 projected revenue)
Forward P/E  6.31
Low float of 4.17 million shares.
Quarterly revenue growth (yoy) 68.5%
Quarterly earnings growth (yoy) 51.8%

Aggressive growth, new technology, oversold and rated a "buy "everywhere you look. All attributes we look for in a winner.

The Team

*DISCLAIMER*[2]

*Smallcaptraders is a wholly owned subsidiary of Small Cap Specialists LLC, herein referred to as SCS LLC.*

*Our reports/releases are a commercial advertisement and are for general information purposes ONLY. We are engaged in the business of marketing and advertising companies for monetary compensation. Never invest in any stock featured on our site or emails unless you can afford to lose your entire investment. The disclaimer is to be read and fully understood before using our services, joining our site or our email/blog list as well as any social networking platforms we may use.*

*PLEASE NOTE WELL: SCS LLC and its employees are not a Registered Investment Advisor, Broker Dealer or a member of any association for other research providers in any jurisdiction whatsoever.*

*Release of Liability: Through use of this website viewing or using you agree to hold SCS LLC, its operator's owners and employees harmless and to completely release them from any and all liability due to any and all loss (monetary or otherwise), damage (monetary or otherwise), or injury (monetary or otherwise) that you may incur. The information contained herein is based on sources which we believe to be reliable but is not guaranteed by us as being accurate and does not purport to be a complete statement or summary of the available data. SCS LLC encourages readers and investors to supplement the information in these reports with independent research and other professional advice. All information on featured companies is provided by the companies profiled, or is available from public sources and SCS LLC makes no representations, warranties or guarantees as to the accuracy or completeness of the disclosure by the profiled companies. None of the materials or advertisements herein constitute offers or solicitations to purchase or sell securities of the companies profiled herein and any decision to invest in any such company or other financial decisions should not be made based upon the information provide herein. Instead SCS LLC strongly urges you conduct a complete and independent investigation of the respective companies and consideration of all pertinent risks. Readers are advised to review SEC periodic reports: Forms 10-Q, 10K, Form 8-K, insider reports, Forms 3, 4, 5 Schedule 13D. SCS LLC is compliant with the Can Spam Act of 2003. SCS LLC does not offer such advice or analysis, and SCS LLC further urges you to consult your own independent tax, business, financial and investment advisors. SCS LLC has been compensated thirty thousand dollars' cash via bank wire by Southern Steel and Construction, Inc. for two to three days' coverage of CETX. Investing in micro-cap and growth securities is highly speculative and carries and extremely high degree of risk. It is possible that an investor's investment may be lost or impaired due to the speculative nature of the companies profiled.*

---

[2] Emphasis contained in original unless otherwise noted.

98.     Although the disclaimer stated that the promotion was paid for by Southern Steel, the promotion failed to disclose that it was actually paid for indirectly by the Company.

99.     The Individual Defendants breached their fiduciary duties by directly or indirectly causing the stock promoters to publish false and misleading promotions, which failed to disclose that they were actually paid for by the Company.

**Defendant S. Govil's Excessive Compensation**

100.    The Individual Defendants were unjustly enriched as a result of their engagement in the schemes described herein. Defendant S. Govil was particularly unjustly enriched through excessive compensation awarded to him.

101.    As the stock promotion scheme was underway, the Individual Defendants caused the Company to award S. Govil stock options to purchase 200,000 shares of Cemtrex common stock on February 12, 2016, with an option strike price of $1.70 per share.  The options were subject with a vesting period of two years, with half being vested and exercisable as of the one-year anniversary of the grant and the remaining half on the second anniversary, provided that S. Govil continued to be employed by Cemtrex.

102.    On December 6, 2015, Cemtrex again granted S. Govil the option to purchase an additional 200,000 shares of Cemtrex common stock at an exercise price of $4.24 per share, also vesting over a two-year period.

103.    In addition to these stock grants, Defendant S. Govil's salary was increased from $150,000 in 2016 to $250,000 in 2017 while the Company's stock price was being artificially inflated.

104.     Such compensation was unjust in light of Defendant S. Govil's involvement in, and responsibility for, the misconduct alleged herein.

**The Company's Purported Ownership of Cemtrex India**

105.     In the Company's Form 10-K filed with the SEC on January 14, 2011, Cemtrex represented that it owned Cemtrex India, a purported subsidiary in India.  Cemtrex claimed, *inter alia*, that it set up Cemtrex India to sell products to industrial clients in India and nearby countries.

106.     In Company's Form 10-Qs filed with the SEC following its January 14, 2011 Form 10-K, Cemtrex clearly indicated it wholly-owned Cemtrex India, stating, in relevant part:

> The accompanying consolidated financial statements include the accounts of Cemtrex, Inc. and its wholly subsidiaries Griffin Filters, LLC and Cemtrex India Pvt. Ltd., (collectively the "Company").

107.     Beginning with the Company's Form 10-K filed with the SEC on January 10, 2012, the Company ceased to mention Cemtrex India in its SEC filings.  However, when the Company filed its Form 10-K with the SEC on December 21, 2015, Cemtrex noted specifically that Cemtrex India was 100% owned by the Company.  After the Company filed a Form 10-K/A filed with the SEC on August 25, 2016, which made the same representation, the Company again ceased to mention Cemtrex India in its SEC filings.

108.     Yet, as revealed in the Unemon1 Blog Posts, the Company has no ownership interest in Cemtrex India. In fact, Cemtrex India, after its incorporation with the Indian Ministry of Corporate Affairs in 2008, reported that Defendant A. Govil controlled 75% of its outstanding shares.  As of March 31, 2015, Defendant A. Govil controlled 80% of Cemtrex India's shares. Moreover, in a July 28, 2015 consent letter signed by Defendant A. Govil as a director of Cemtrex India, he explicitly represented that he owned shares in Cemtrex India in his own name.

**Defendant A. Govil's Scheme to Benefit Himself and Ducon**

109.   On December 30, 2004, the Company purchased certain business assets from Ducon relating to the design, assembly, sale, and maintenance of environmental emissions monitors.  In consideration for the purchase, Ducon was issued 3,250,000 shares of Company stock (valued at approximately $500,000) by Cemtrex.  The asset purchase agreement governing the transaction was signed by A. Govil on behalf of Ducon (A. Govil also served as President of Cemtrex at the time) and Defendant Dela Rama as Vice President of Cemtrex.  This transaction was designed by Defendant A. Govil to allow him to enrich himself through both Ducon and Cemtrex.

110.   By the end of 2008, Defendant A. Govil controlled over 86% of the Company's common stock.

111.   With his control of the Company, Defendant A. Govil used Cemtrex to self-deal, selling assets that he controlled to Cemtrex in order to loan money to Cemtrex to finance the purchases, in exchange for which he received favorable note terms and/or additional equity in Cemtrex.  Defendant A. Govil caused Cemtrex and Ducon to engage in these related-party transactions, which included the purchase of millions of dollars in goods by Ducon from Cemtrex from 2010 to 2013.

**The Company Expands Operations, Using its Own Stock as Currency**

112.   While the Company's stock price was artificially inflated due to the stock promotion scheme and false and misleading statements described herein, the Individual Defendants caused the Company to expand its operations through acquisitions, largely using the Company's common stock to complete the acquisition.

113.    As Cemtrex is highly leveraged and unable to secure financing through traditional means, the Company is reliant on utilizing its common stock as currency and related-party debt financing from Ducon to fund its acquisitions.

114.    For example, on December 15, 2015, the Company acquired Advanced Industrial Services, Inc. for a purchase price of approximately $7.7 million, consisting of $5.2 million in cash financed through a bank loan, $1.0 million from the issuance of Company common stock, and $1.5 million in a seller note.  On May 31, 2016, the Company acquired machinery and equipment and the electronics manufacturing and logistics businesses of Periscope GmbH ("Periscope") for a purchase price consisting of $4,902,670 in cash, $3,298,600 in proceeds from the issuance of a note to Ducon, and $717,936 in a seller note.

115.    Per the Company's Form 10-K filed with the SEC on December 13, 2017, Cemtrex decided to exchange the long-term debt owed to Ducon from its financing of Periscope for 333,983 shares of the Company's series 1 preferred stock and 667,967 series 1 warrants.

116.    Nearly all of the Company's acquisitions involved using funds from Ducon, which would later be converted into equity in Cemtrex.  Cemtrex's reliance on Ducon was due to the Company being otherwise ineligible to raise funds through a S-3 shelf registration and offering.

117.    On April 12, 2015, the Company filed a Form S-3 registration statement with the SEC, seeking to offer $10 million in the aggregate of common stock, preferred stock, debt securities, depository shares, purchase contracts, warrants, and units.

118.    The SEC rejected the Company's offering, sending a letter on May 9, 2016 setting forth over 30 different questions or concerns that the SEC had with the Company's Form S-3 registration statement and related filings.  On May 17, 2016, Defendant S. Govil submitted a letter

to the SEC requesting a withdrawal of the Company's Form S-3 registration statement, stating that "[a]t this time, the Company has determined that it is unlikely that it will meet the eligibility requirements for use of the Registration Statement."

### Certain of the Individual Defendants Fail to Report Securities Transactions

119.    During the Relevant Period, Defendants A. Govil, S. Govil, Dela Rama, Panjwani, Patel, and Shah engaged in transactions involving Cemtrex securities without filing required reports with the SEC pursuant to Section 16(a) of the Exchange Act.  These transactions, made with undisclosed insider information, were not disclosed in order to avoid causing a decline in the price of the Company's stock, which decline would also, in turn, prevent Cemtrex acquisitions.

120.    Corporate insiders, pursuant to SEC regulations and federal law, must file with the SEC a statement of ownership regarding the securities they own in a company if they are an officer or director of that company, or any beneficial owner of more than 10 percent of a class of the company's equity securities registered under Section 12 of the Exchange Act.

121.    On May 13, 2018, he Company filed a Form 10 General Form for Registration of Securities with the SEC, seeking to register the Company's common stock pursuant to Section 12 of the Exchange Act.  On November 25, 2008, in the final amendment to that registration statement on Form 10-12G/A, Cemtrex provided the purported stock ownership of its insiders.

122.    Defendants A. Govil, S. Govil, Dela Rama, Panjwani, Patel, and Shah failed to file timely SEC disclosure forms indicating their holdings and transactions in the Company's common stock, actively keeping material information from the investing public.  Such conduct is made evident in a review of various of the Company's and these Defendants' filings with the SEC, which show an incongruence between the reported stock ownership of these Defendants by the Company

and the stock ownership that these individuals reported themselves. The collective engagement in this scheme despite well-known requirements mandating otherwise indicates an intentional determination to unlawfully avoid disruption of Cemtrex's stock price, which was concurrently being artificially inflated through the misconduct described herein.

123. After the truth was revealed in the February 22, 2017 Pearson Exposé and Unemon1 Blog Posts, Company insiders, including Defendants Dela Rama, S. Govil, Shah, and Patel, began to file their untimely Form 3s and Form 4s with the SEC.

**The Individual Defendants Improperly Tout Cemtrex's EMS Automotive Segment**

124. The Individual Defendants, in an attempt to strengthen the Company's forthcoming rights offering, caused the Company to tout its EMS Automotive segment despite its ongoing issues. As part of the Periscope GmbH acquisition noted above, the Company added an automotive-focuses electronics line to Cemtrex's German-based EMS segment. On September 8, 2016, Cemtrex issued a press release stating that it "has fully integrated its recent acquisition of Periscope, an electronics manufacturing company located in Paderborn, Northwestern Germany . . . now operating as ROB Cemtrex Automotive GmbH." The press release additionally forecasted that ROB Cemtrex Automotive GmbH ("ROB Cemtrex") would add an additional $33 million in revenue over the next 12 months.

125. In a December 13, 2016 press release, Cemtrex noted an automotive industry poised for growth and that the Company was "extremely optimistic about the opportunities in front of us and our ability to leverage them with our growing organization."

126. On August 29, 2016, Cemtrex filed a Form S-1 Registration Statement with the SEC related to the Company's warrants and preferred shares rights offering, which was declared

- 38 -

effective on December 12, 2016, just the day before the Company's press release touting the Company's potential for opportunity in the automotive industry.

127.    As the Company was not able to secure financing from traditional sources, Cemtrex needed the capital that would be provided through the rights offering.

128.    However, despite the Company's statements indicating otherwise, ROB Cemtrex's prospects were non-existent, as became apparent to Cemtrex almost immediately as it saw decreasing sales and new orders month-after-month, which would lead to the Paderborn, Germany facility being shut down and the laying off of hundreds of employees soon after the acquisition.

## The Individual Defendants Cause the Company to Engage an Auditing Firm to Look the Other Way

129.    The Company engaged Bharat Parikh & Associates as its principal independent registered accountant, beginning in February 2014.  For 2014, 2015, and 2016, Bharat Parikh & Associates was compensated just $15,000, $20,000, and $21,750, respectively, for their auditing work carried out for the Company.  Bharat Parikh & Associates' audit reports for these fiscal years claimed that its audit was carried out in accordance with the standards of the Public Company Accounting Oversight Board ("PCAOB").

130.    As discussed in further detail herein, Bharat Parikh & Associates is a firm with a history of misconduct that looked the other way while the Individual Defendants caused the Company to engage in the misconduct discussed herein.

131.    In April 2013, Bharat Parikh & Associates had an order entered against them by the PCAOB, which instituted disciplinary proceedings censuring the firm, revoking its registration and imposing a civil monetary penalty against the firm due to "numerous and repeated violations of PCAOB rules, quality control standards, and auditing standards."

132.    Notably, the Company paid more to certain auditors for services performed in connection with the Company's loan covenants than it did to Bharat Parikh & Associates in 2016 for auditing the entire Company, for example paying Stambaugh Ness P.C. $26,000 to audit Cemtrex subsidiary Advanced Industrial Systems pursuant to loan covenants.

**False and Misleading Statements**

***December 26, 2012 Form 10-K***

133.    On December 26, 2012, the Company filed an annual report for the fiscal year ended September 30, 2012 on a Form 10-K with the SEC (the "2012 10-K"), which was signed by Defendants S. Govil, Dela Rama, and A. Govil.  As to whether the Company's officers, directors, and greater than 10 percent beneficial owners had filed all appropriate disclosures pursuant to Section 16(a) of the Exchange Act, the 2012 10-K stated, in relevant part:

SECTION 16(A) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE

To the best of our knowledge, based solely on a review of the copies of such reports furnished to us and written representation that no other reports are required, Section 16(a) filing requirements applicable to our officers, directors, and greater than ten percent beneficial owners were filed timely during the most recent fiscal year.

134.    Attached to the 2012 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants S. Govil and Dela Rama attesting to the accuracy of the 2012 10-K.

***January 3, 2013 Form 10-K/A***

135.    On January 3, 2013, the Company filed an amendment to the 2012 10-K with the SEC (the "2012 10-K/A"), which was signed by Defendants S. Govil, Dela Rama, and A. Govil. As to whether the Company's officers, directors, and greater than 10 percent beneficial owners

had filed all appropriate disclosures pursuant to Section 16(a) of the Exchange Act, the 2012 10-K/A stated, in relevant part:

SECTION 16(A) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE

To the best of our knowledge, based solely on a review of the copies of such reports furnished to us and written representation that no other reports are required, Section 16(a) filing requirements applicable to our officers, directors, and greater than ten percent beneficial owners were filed timely during the most recent fiscal year.

136.    Attached to the 2012 10-K/A were SOX certifications signed by Defendants S. Govil and Dela Rama attesting to the accuracy of the 2012 10-K/A.

### *January 16, 2014 Form 10-K*

137.    On January 16, 2014, the Company filed an annual report for the fiscal year ended September 30, 2013 on a Form 10-K with the SEC (the "2013 10-K"), which was signed by Defendants S. Govil and Dela Rama.  As to whether the Company's officers, directors, and greater than 10 percent beneficial owners had filed all appropriate disclosures pursuant to Section 16(a) of the Exchange Act, the 2013 10-K stated, in relevant part:

SECTION 16(A) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE

To the best of our knowledge, based solely on a review of the copies of such reports furnished to us and written representation that no other reports are required, Section 16(a) filing requirements applicable to our officers, directors, and greater than ten percent beneficial owners were filed timely during the most recent fiscal year.

138.    Attached to the 2013 10-K were SOX certifications signed by Defendants S. Govil and Dela Rama attesting to the accuracy of the 2013 10-K.

### *June 13, 2014 Form 10-K/A*

139.    On June 13, 2014, the Company filed an amendment to the 2013 10-K with the SEC (the "2013 10-K/A"), which was signed by Defendants S. Govil and Dela Rama.  As to whether the Company's officers, directors, and greater than 10 percent beneficial owners had filed

all appropriate disclosures pursuant to Section 16(a) of the Exchange Act, the 2013 10-K/A stated, in relevant part:

> SECTION 16(A) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE
>
> To the best of our knowledge, based solely on a review of the copies of such reports furnished to us and written representation that no other reports are required, Section 16(a) filing requirements applicable to our officers, directors, and greater than ten percent beneficial owners were filed timely during the most recent fiscal year.

140.    Attached to the 2013 10-K/A were SOX certifications signed by Defendants S. Govil and Dela Rama attesting to the accuracy of the 2013 10-K/A.

### September 26, 2014 Form 10-K/A

141.    On September 26, 2014, the Company filed a second amendment to the 2013 10-K with the SEC (the "Second 2013 10-K/A"), which was signed by Defendants S. Govil and Dela Rama.  As to whether the Company's officers, directors, and greater than 10 percent beneficial owners had filed all appropriate disclosures pursuant to Section 16(a) of the Exchange Act, the Second 2013 10-K/A stated, in relevant part:

> SECTION 16(A) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE
>
> To the best of our knowledge, based solely on a review of the copies of such reports furnished to us and written representation that no other reports are required, Section 16(a) filing requirements applicable to our officers, directors, and greater than ten percent beneficial owners were filed timely during the most recent fiscal year.

142.    Attached to the Second 2013 10-K/A were SOX certifications signed by Defendants S. Govil and Dela Rama attesting to the accuracy of the Second 2013 10-K/A.

### November 13, 2014 Proxy Statement

143.    On November 13, 2014, the Company filed a Schedule 14A with the SEC (the "2014 Proxy Statement"), submitted by Defendant Dela Rama by order of the Board.  As to whether the Company's officers, directors, and greater than 10 percent beneficial owners had filed

all appropriate disclosures pursuant to Section 16(a) of the Exchange Act, the 2014 Proxy

Statement stated, in relevant part:

### Section 16 (a) Beneficial Ownership Reporting Compliance of the Securities Exchange Act

Section 16(a) of the Exchange Act requires the Company's executive officers, directors and persons who own more than 10% of a registered class of the Company's equity securities ("Reporting Persons") to file reports of ownership and changes in ownership on Forms 3, 4, and 5 with the SEC. These Reporting Persons are required by SEC regulation to furnish the Company with copies of all Forms 3, 4 and 5 they file with the SEC. Based solely on the Company's review of the copies of the forms it has received, the Company believes that all Reporting Persons complied on a timely basis with all filing requirements applicable to them with respect to transactions during Fiscal 2014.

144.    The statements referenced in ¶¶ 133-43 above were materially false and misleading

because they misrepresented and failed to disclose material adverse facts pertaining to the

Company's business, operations, and internal controls, which were known to the Individual

Defendants or recklessly disregarded by them.  Specifically, these false and misleading statements

of material fact failed to disclose that the Individual Defendants: (1) the Individual Defendants

caused Cemtrex to falsely state the stock ownership totals of its insiders in the Company's SEC

filings; (2) Defendants A. Govil, S. Govil, and Dela Rama engaged in lucrative undisclosed insider

sales; (3) Defendants A. Govil, S. Govil, Dela Rama, Panjwani, Patel, and Shah failed to meet

mandatory reporting requirements under Section 16(a) of the Exchange Act; and (4) the Company

failed to maintain adequate internal controls.

### *December 18, 2015 Press Release*

145.    On December 18, 2015, the Company issued a press release titled "Cemtrex

Announces 2015 Annual Results, Sales Increase By 19%."  In it, Cemtrex failed to disclose the

Individual Defendants' engagement in the stock promotion scheme outlined herein and the Company's failure to maintain adequate internal controls.

146.    In its press release, the Company provided results for the fiscal year ended September 30, 2015 and stated, in relevant part:

Fiscal Year 2015 Highlights:

- Revenue increased by 19% to $56,887,389 for the twelve months ended in September 30, 2015 compared to $47,653,114 for the same period in 2014.
- Revenue increased 3% to $14,047,912, for the three months ended in September 30, 2015 compared to $13,686,428 for the same period in 2014.
- Revenue increased 3% to $14,047,912, for the three months ended in September 30, 2015 compared to $13,686,428 for the same period in 2014.

147.    Defendant S. Govil commented:

"This past year we were able to capitalize on the momentum that we created in 2014 and hence the revenues increased almost 20% organically. We have been able to establish a repeat customer base through our proven technologies, cost-effective manufacturing, and on-time delivery of equipment which creates a positive outlook for sustainable revenue growth. However, the global economic downturn in oil and commodity prices did create a competitive environment which resulted in lower gross profit in fiscal 2015 as compared to fiscal 2014.

Overall, this year was a positive year for Cemtrex with uplisting to Nasdaq as a major achievement. We have seen our number of shareholders increase by almost 30% and an increase in our average trading volume of almost tenfold. Additionally, Cemtrex on December 15, 2015, completed the transformative acquisition of Advanced Industrial Services Inc., that adds approximately $23 million to our annual revenues. With all these factors combined with the reinvigorated global interest in curbing air pollution, we believe there is a lot to look forward to, as we continue to create value for our shareholders in the coming year."

***December 21, 2015 Form 10-K***

148.    On December 21, 2015, the Company filed an annual report for the fiscal year ended September 30, 2015 on a Form 10-K with the SEC (the "2015 10-K"), which was signed by Defendants S. Govil, Dela Rama, Panjwani, Patel, Shah, and A. Govil.  The 2015 10-K reiterated substantially the same results announced in the December 18, 2015 press release.  The 2015 10-K

also indicated that the Company had a 100% ownership of Cemtrex India. The statements made in the 2015 10-K were materially false and misleading because they failed to disclose material adverse facts pertaining to the Company's business, operations, and internal controls, including the Individual Defendants' engagement in the stock promotion scheme outlined herein and the Company's failure to maintain adequate internal controls.

149. Attached to the 2015 10-K were SOX certifications signed by Defendants S. Govil and Dela Rama attesting to the accuracy of the 2015 10-K.

### *February 8, 2016 Proxy Statement*

150. On February 8, 2016, the Company filed a Schedule 14A with the SEC (the "2016 Proxy Statement"), submitted by Defendant Dela Rama by order of the Board. As to whether the Company's officers, directors, and greater than 10 percent beneficial owners had filed all appropriate disclosures pursuant to Section 16(a) of the Exchange Act, the 2016 Proxy Statement stated, in relevant part:

**Section 16 (a) Beneficial Ownership Reporting Compliance of the Securities Exchange Act**

Section 16(a) of the Exchange Act requires the Company's executive officers, directors and persons who own more than 10% of a registered class of the Company's equity securities ("Reporting Persons") to file reports of ownership and changes in ownership on Forms 3, 4, and 5 with the SEC. These Reporting Persons are required by SEC regulation to furnish the Company with copies of all Forms 3, 4 and 5 they file with the SEC. Based solely on the Company's review of the copies of the forms it has received, the Company believes that all Reporting Persons complied on a timely basis with all filing requirements applicable to them with respect to transactions during Fiscal 2015.

151. The 2016 Proxy Statement also failed to disclose that the Individual Defendants: (1) engaged in a scheme to manipulate the price and trading volume of Cemtrex's stock by paying stock promoters to disseminate false and misleading articles and promotions concerning the

Company; (2) caused the Company to conceal that the Company paid stock promoters through an undisclosed entity owned by A. Govil; (3) caused Cemtrex to falsely state the stock ownership totals of its insiders in the Company's SEC filings; (4) exchanged debt instruments for additional Cemtrex securities, further entrenching Defendant A. Govil's control over the Company; (5) caused the Company to claim to own an Indian subsidiary that it did not actually have ownership of; (6) caused the Company to tout the financial outlook for the automotive electronics sector and Cemtrex's opportunity to capitalize on the expected growth in that sector, despite Cemtrex's poor performance in that sector, which led to a decision to shut down a recently acquired automotive electronics manufacturing plant in Germany; (7) caused the Company to fail to maintain adequate internal controls by, *inter alia*, using a fraudulent Company auditor that was signing off on the Company's financial disclosures without conducting a proper review.

152.    Moreover, the 2016 Proxy Statement failed to disclose that: (1) Defendants A. Govil, S. Govil, and Dela Rama engaged in lucrative undisclosed insider sales; and (2) Defendants A. Govil, S. Govil, Dela Rama, Panjwani, Patel, and Shah failed to meet mandatory reporting requirements under Section 16(a) of the Exchange Act.

### February 11, 2016 Press Release

153.    On February 11, 2016, the Company issued a press release titled "Cemtrex, Inc. Announces Q1 Results With Earnings Per Share Increasing 50%." In its press release, the Company provided results for the fiscal quarter ended December 31, 2015 and stated, in relevant part:

First Quarter Highlights:

- Earnings per share for the three months ended December 31, 2015 increased by 50% to $.09 from $.06 for the three months ended December 31, 2014.

- 46 -

- Net Income for the three months ended December 31, 2015 increased by 74% to $692,395 from $396,872 for the three months ended December 31, 2014.
- Net Income for the three months ended December 31, 2015 increased by 74% to $692,395 from $396,872 for the three months ended December 31, 2014.

154. In the press release, Defendant S. Govil commented:

"This quarter we experienced headwinds due to the decline in oil & gas markets, however this was offset by an increase in demand in some of our other industrial and power markets. Revenues were down 4% but we are pleased with the outcome of our operating results with an increase in earnings per share. The fundamentals in our business remain strong and we are focused on continued profitable growth."

***February 16, 2016 Form 10-Q***

155. On February 16, 2016, Cemtrex filed a quarterly report for the fiscal quarter ended December 31, 2015 on a Form 10-Q with the SEC (the "1Q 2016 10-Q"), which was signed by Defendants S. Govil and Dela Rama. The 1Q 2016 10-Q reiterated substantially the same results announced in the February 11, 2016 press release.

156. Attached to the 1Q 2016 10-Q were SOX certifications signed by Defendants S. Govil and Dela Rama attesting to its accuracy.

***May 16, 2016 Form 10-Q***

157. On May 16, 2016, Cemtrex filed a quarterly report for the fiscal quarter ended March 31, 2016 on a Form 10-Q with the SEC (the "2Q 2016 10-Q"), which was signed by Defendants S. Govil and Dela Rama.

158. The 2Q 2016 10-Q provided "Results of Operations – For the three months ending March 31, 2016 and 2015":

Total revenue for the three months ended March 31, 2016 and 2015 was $18,908,100 and $14,330,940, respectively, an increase of $4,577,160, or 32%. Net income for the three months ended March 31, 2016 and 2015 was $829,896 and $1,081,573, respectively, a decrease of $251,677, or 23%. Net income in the second quarter decreased, as compared to net income in the same period last year, due to one-time expenses related to certain planned and uncompleted acquisitions and other corporate marketing expenses.

*Revenues*

Our IPS group's revenues for three months ended March 31, 2016 increased by $5,727,531 or 80%, to $12,872,775 from $7,145,244 for the three months ended March 31, 2015. The increase was primarily due to the acquisition of AIS on December 15, 2015.

Our EMS group's revenues for the three months ended March 31, 2016 decreased by $1,150,371 or 16% to $6,035,325 from $7,185,696 for the three months ended March 31, 2015. The primary reason for decreased sales was due to the postponement of the execution of in-house orders during this quarter as compared to the same quarter a year ago.

*Gross Profit*

Gross Profit for the three months ended March 31, 2016 was $5,832,728 or 31% of revenues as compared to gross profit of $4,244,508 or 30% of revenues for the three months ended March 31, 2015. The gross profit percentage has increased slightly in the three months ended March 31, 2016 compared to the same period in the prior year due to the mix of products shipped and services offered during the respective quarters.

*Operating Expenses*

Operating expenses for the three months ended March 31, 2016 increased $1,490,707 or 43% to $4,937,642 from $3,446,935 for the three months ended March 31, 2015. Operating expenses as a percentage of revenue increased to 26% of revenues for the three month period ended March 31, 2016 compared to 24% for the three month period ended March 31, 2015. The increases in operating expenses as a percentage were primarily due to one-time expenses related to certain planned and uncompleted acquisitions and other corporate marketing expenses.

*** 

*Net Income/Loss*

The Company had net income of $829,896 or 4% of revenues, for the three month period ended March 31, 2016 as compared to a net income of $1,081,573 or 8% of revenues, for the three months ended March 31, 2015. Net income in the second quarter decreased, as compared to net income in the same period last year, due largely to one-time expenses related to certain planned and uncompleted acquisitions and other corporate marketing expenses.

159.    Attached to the 2Q 2016 10-Q were SOX certifications signed by Defendants S.

Govil and Dela Rama attesting to its accuracy.

- 48 -

*August 8, 2016 Press Release*

160.    On August 8, 2016, the Company issued a press release titled "Cemtrex Announces

Q3 Sales of $24.7 Million, An Increase of 69%." In its press release, the Company provided results

for the fiscal quarter ended June 30, 2016 and stated, in relevant part:

- Net sales for the quarter up 69%
- Net income for the quarter up 77%
- Net sales for nine months up 33%[;] Net Income for nine months up 26.5%
- EBITDA for the quarter up 79%
- EBITDA for nine months up 50%

**Third Quarter Highlights:**

- Net sales for the three months ended June 30, 2016 increased by 69% to $24,714,853 from $14,665,748 for the three months ended June 30, 2015.
- Gross profit for the three months ended June 30, 2016 was $8,158,669 as compared to $4,252,202 for the three months ended June 30, 2015, representing a 92% advance. Gross profit margin was 33% compared to 29%, as the company realized economies of scale and an improving product mix.
- Net Income for the three months ended June 30, 2016 was $1,470,625 as compared to $828,758 for the three months ended June 30, 2015, representing an increase of 77.5%.
- EBITDA for the three months ended June 30, 2016 was $1,965,353 as compared to $1,096,586 for the three months ended June 30, 2015, representing a 79% increase.

*** 

**Other Recent Highlights:**

- Completed the accretive acquisition of an electronic manufacturing services (EMS) company based in northern Germany on May 31, 2016, greatly strengthening the Company's existing position in the EMS sector in this market.
- Received $12 million in new orders from both existing and new customers in June, representing the strongest bookings month in the Company's history. The Company's newly acquired German electronics operation obtained an important order from a strategic new customer in the automotive industry.

161.    In the press release, Defendant S. Govil commented:

"We believe our results this quarter validate our strategy to focus on our core strengths and enhance our organic growth with attractive acquisitions. We achieved strong operating

performance with improvements in both top and bottom line results. With a new strategic customer at our German subsidiary, we are already seeing benefits from our latest acquisition. I want to commend our team for continuing to execute at a high level. Overall, we are focused on new opportunities for growth and are optimistic about our prospects for the future."

***August 15, 2016 Form 10-Q***

162.    On August 15, 2016, Cemtrex filed a quarterly report for the fiscal quarter ended June 30, 2016 on a Form 10-Q with the SEC (the "3Q 2016 10-Q"), which was signed by Defendants S. Govil and Dela Rama.  The 3Q 2016 10-Q reiterated substantially the same results announced in the August 8, 2016 press release.

163.    Attached to the 3Q 2016 10-Q were SOX certifications signed by Defendants S. Govil and Dela Rama attesting to its accuracy.

***October 26, 2016 Press Release***

164.    On October 26, 2016, the Company issued a press release titled "Cemtrex Announces Preliminary Fiscal Year 2016 Results."  In its press release, the Company provided preliminary results for the fiscal year ended September 30, 2016 and stated, in relevant part:

Sales for FY 2016 are up 64% and net income is up 73%

***

Cemtrex . . . today announced preliminary financial results for the fiscal year ended September 30, 2016.  For the year, the Company anticipates that consolidated sales will be in the range of $93 million to $95 million and net income will be in the range of $4.8 million to $5.0 million. The Company anticipates that EBITDA for the FY 2016 will be in the range of $6.6 to $7.0 million compared to $3.9 million a year ago and that earnings per share will increase to $0.52 per share based on approximately 9.4 million shares outstanding as compared to $.40 per share in last fiscal year based on approximately 7.0 million shares outstanding. These preliminary financial results represent the most current information available to management and are subject to completion of the Company's customary year-end closing and review procedures, as well as the completion of the audit by the Company's independent auditor.

***

The Company anticipates releasing its year-end results in late December and will provide an update and outlook for fiscal year 2017 at that time.

165.     In the press release, Defendant S. Govil commented:

"With FY 2016 revenue up at least 64% compared to the prior year and EBIDTA up approximately 74% compared to the similar period a year ago, we have delivered 571% sales growth and 1600% net income growth since fiscal 2013.  During this period we have positioned the Company towards a diversified model which aims to capitalize on the continued global growth in highly advanced electronics manufacturing and the industrial equipment and services markets, thus providing increasing momentum for continued profitable growth in the coming years."

***December 22, 2016 Press Release***

166.     On December 22, 2016, the Company issued a press release titled "Cemtrex Announces FY 2016 Annual Results: Sales Increase By 65% and Net Income Up By 76%."  In its press release, the Company announced results for the fiscal year ended September 30, 2016 and stated, in relevant part:

Fiscal Year 2016 Highlights:

Revenue increased by 65% to $93,704,560 for the twelve months ended in September 30, 2016 compared to $56,887,389 for the same period in 2015.
Net Income was up 76% to $4,994,045, equaling $0.59 per share, in the twelve month period ended September 30, 2016 compared to an income of $2,838,116 or $0.41 in the same period in 2015.
EBITDA was up 120% to $9,053,839 in the twelve month period ended September 30, 2016 compared to EBITDA of $4,107,748 in the same period in 2015.

167.     In the press release, Defendant S. Govil commented:

"This past year we were able to complete two strategic acquisitions that allowed our revenues to increase 65%. Out net income also increased 76% mainly due to the increased income from the acquired operations. We have been able to establish a repeat customer base through our proven technologies, cost-effective manufacturing, and on-time delivery of equipment which creates a positive outlook for sustainable revenue growth."

"Overall, this year was a great year for Cemtrex as we have seen our number of shareholders increase substantially and a significant increase in our average trading volume. Additionally, we have recently filed for a Rights Offering with Source Group,

through the issuance of preferred shares, which when completed, would provide us additional resources for pursuing larger acquisitions. Furthermore, with the incoming Trump administration's plan for increased infrastructure and manufacturing spending, we believe there is a lot to look forward to, as we continue to create value for our shareholders in the coming year."

### December 28, 2016 Form 10-K

168.    On December 28, 2016, the Company filed an annual report for the fiscal year ended September 30, 2016 on a Form 10-K with the SEC (the "2016 10-K"), which was signed by Defendants S. Govil, Dela Rama, Panjwani, Patel, Shah, and A. Govil.  The 2016 10-K reiterated substantially the same results announced in the December 22, 2016 press release.

169.    Attached to the 2016 10-K were SOX certifications signed by Defendants S. Govil and Dela Rama attesting to its accuracy.

170.    The statements referenced in ¶¶ 145-49 and 153-69 above were materially false and misleading because they misrepresented and failed to disclose material adverse facts pertaining to the Company's business, operations, and internal controls, which were known to the Individual Defendants or recklessly disregarded by them.  Specifically, these false and misleading statements of material fact failed to disclose that the Individual Defendants: (1) engaged in a scheme to manipulate the price and trading volume of Cemtrex's stock by paying stock promoters to disseminate false and misleading articles and promotions concerning the Company; (2) caused the Company to conceal that the Company paid stock promoters through an undisclosed entity owned by A. Govil; (3) caused Cemtrex to falsely state the stock ownership totals of its insiders in the Company's SEC filings; (4) exchanged debt instruments for additional Cemtrex securities, further entrenching Defendant A. Govil's control over the Company; (5) caused the Company to claim to own an Indian subsidiary that it did not actually have ownership of; (6) caused the Company to tout the financial outlook for the automotive electronics sector and Cemtrex's opportunity to

capitalize on the expected growth in that sector, despite Cemtrex's poor performance in that sector, which led to a decision to shut down a recently acquired automotive electronics manufacturing plant in Germany; and (7) caused the Company to fail to maintain adequate internal controls by, *inter alia*, using a fraudulent Company auditor that was signing off on the Company's financial disclosures without conducting a proper review.

171.    Moreover, the Individual Defendants made and/or caused the Company to make false and misleading statements of material fact that failed to disclose that: (1) Defendants A. Govil, S. Govil, and Dela Rama engaged in lucrative undisclosed insider sales; and (2) Defendants A. Govil, S. Govil, Rama, Panjwani, Patel, and Shah failed to meet mandatory reporting requirements under Section 16(a) of the Exchange Act.

### *January 30, 2017 Proxy Statement*

172.    On January 30, 2017, the Company filed the 2017 Proxy Statement, submitted by Defendant Dela Rama by order of the Board.  The 2017 Proxy Statement noted that the Company believed that Defendants Panjwani, Patel, Shah, and S. Govil failed to make filings required by Section 16(a) of the Exchange Act.

173.    The 2017 Proxy Statement failed to disclose that the Individual Defendants: (1) engaged in a scheme to manipulate the price and trading volume of Cemtrex's stock by paying stock promoters to disseminate false and misleading articles and promotions concerning the Company; (2) caused the Company to conceal that the Company paid stock promoters through an undisclosed entity owned by A. Govil; (3) caused Cemtrex to falsely state the stock ownership totals of its insiders in the Company's SEC filings; (4) exchanged debt instruments for additional Cemtrex securities, further entrenching Defendant A. Govil's control over the Company; (5) caused the Company to claim to own an Indian subsidiary that it did not actually have ownership

of; (6) caused the Company to tout the financial outlook for the automotive electronics sector and Cemtrex's opportunity to capitalize on the expected growth in that sector, despite Cemtrex's poor performance in that sector, which led to a decision to shut down a recently acquired automotive electronics manufacturing plant in Germany; (7) caused the Company to fail to maintain adequate internal controls by, *inter alia*, using a fraudulent Company auditor that was signing off on the Company's financial disclosures without conducting a proper review.

174.    Moreover, the 2017 Proxy Statement failed to disclose that: (1) Defendants A. Govil, S. Govil, and Dela Rama engaged in lucrative undisclosed insider sales; and (2) Defendants A. Govil and Dela Rama failed to meet mandatory reporting requirements under Section 16(a) of the Exchange Act.

### February 9, 2017 Press Release

175.    On February 9, 2017, the Company issued a press release titled "Cemtrex, Inc. FY 2017 Q1 Net Income Up 103%, EBITDA Up 138% and EPS Increasing 56%." The press release announced results for the fiscal quarter ended December 31, 2016 and stated, in relevant part:

First Quarter Highlights:

Earnings per share for the three months ended December 31, 2016 increased by 56% to $.14 from $.09 for the three months ended December 31, 2015.

Net Income for the three months ended December 31, 2016 increased by 103% to $1,405,693 from $692,395 for the three months ended December 31, 2015.

Net sales for the three months ended December 31, 2016 increased by 121% to $29,397,257 from $13,314,693 for the three months ended December 31, 2015.

EBITDA was up 138% to $2,646,181 in the three months period ended December 31, 2016 compared to EBITDA of $1,112,527 in the same period in 2016.

176.    Defendant S. Govil commented in the press release: "We are extremely pleased with our first quarter results and quite proud of what we have accomplished in the past twelve

months.  With our rights offering now complete, we plan to continue on our path of strong growth while executing accretive acquisitions in this fiscal year as well."

### February 14, 2017 Form 10-Q

177.    On February 14, 2017, Cemtrex filed a quarterly report for the fiscal quarter ended December 31, 2016 on a Form 10-Q with the SEC (the "1Q 2017 10-Q"), which was signed by Defendants S. Govil and Dela Rama.  The 1Q 2017 10-Q reiterated substantially the same results announced in the February 9, 2017 press release.

178.    Attached to the 1Q 2017 10-Q were SOX certifications signed by Defendants S. Govil and Dela Rama attesting to its accuracy.

179.    The statements referenced in ¶¶ 174-77 above were materially false and misleading because they misrepresented and failed to disclose material adverse facts pertaining to the Company's business, operations, and internal controls, which were known to the Individual Defendants or recklessly disregarded by them.  Specifically, these false and misleading statements of material fact failed to disclose that the Individual Defendants: (1) engaged in a scheme to manipulate the price and trading volume of Cemtrex's stock by paying stock promoters to disseminate false and misleading articles and promotions concerning the Company; (2) caused the Company to conceal that the Company paid stock promoters through an undisclosed entity owned by A. Govil; (3) caused Cemtrex to falsely state the stock ownership totals of its insiders in the Company's SEC filings; (4) exchanged debt instruments for additional Cemtrex securities, further entrenching Defendant A. Govil's control over the Company; (5) caused the Company to claim to own an Indian subsidiary that it did not actually have ownership of; (6) caused the Company to tout the financial outlook for the automotive electronics sector and Cemtrex's opportunity to capitalize on the expected growth in that sector, despite Cemtrex's poor performance in that sector,

- 55 -

which led to a decision to shut down a recently acquired automotive electronics manufacturing plant in Germany; and (7) caused the Company to fail to maintain adequate internal controls by, *inter alia*, using a fraudulent Company auditor that was signing off on the Company's financial disclosures without conducting a proper review.

180.    Moreover, the Individual Defendants made and/or caused the Company to make false and misleading statements of material fact that failed to disclose that: (1) Defendants A. Govil, S. Govil, and Dela Rama engaged in lucrative undisclosed insider sales; and (2) Defendants A. Govil and Dela Rama failed to meet mandatory reporting requirements under Section 16(a) of the Exchange Act.

181.    As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

***February 22, 2017 Pearson Exposé***

182.    On February 22, 2017, *Seeking Alpha* published the Pearson Exposé, titled "Cemtrex: Documents And Photos, All Signs Point To Deception And Failure." The Pearson Exposé revealed, *inter alia*, that notorious stock promoters were paid over $1 million to promote Cemtrex, Defendant A. Govil was secretly paying promoters through an undisclosed entity, the Company was using a sham auditor, and Cemtrex insiders had been selling shares heavily during the paid promotion period without disclosing these sales.

183.    The Pearson Exposé summarized and listed some of its key findings and supporting evidence, in relevant part:

**Summary**

- On Tuesday, Cemtrex fell 13% on huge volume.  On the preceding trading day, Cemtrex's banker Source Capital quietly had its SEC and FINRA registrations terminated following multiple violations.
- Over $1 million has been paid to notorious stock promoters sending CETX soaring from below $2.  Heavy undisclosed selling by CETX insiders during paid promotion.
- Documents: Founder Aron Govil is secretly paying promoters via an undisclosed entity with little or no other activity.  Using same promoters behind imploded frauds ForceField Energy and Code Rebel.
- Photos: CETX's supposed audit firm traced to vacant strip mall in Texas, no operations.  Controlling partner was banned by SEC for multiple fraudulent audits, under multiple firm names.
- Nearly $100 million in revenues, from four countries on three continents.  Cemtrex pays auditor just $20,000 per year in audit fees to sign off on financials.  Nonsense.

***

*Recent trading*

Yesterday, we saw shares of Cemtrex fall by 13% on nearly 1 million shares of volume with no apparent news.  But, in fact, on the previous trading day (Monday was a holiday), Cemtrex's investment bank, Source Capital, had its SEC and FINRA registrations terminated nationally and in all states.

***

*The fraud*

As my regular readers know, I often express significant concerns about problems I find with publicly traded companies.  But these readers know that I will seldom come out and actually use the word "fraud."

But I feel comfortable that the extensive use of the word "fraud" is entirely appropriate in this article for the reasons below.  **The points I will make below are supported by on the ground photographs as well as official government documents from various agencies.**

1. Cemtrex is being heavily promoted by a promotion firm known as "Small Cap Specialists" (aka "SCS").  Pas SCS promotions have been repeatedly halted or delisted due to financial irregularities or outright **fraud**.  (Examples include delisted frauds ForceField Energy and Code Rebel, among others).  On its website, the SEC has gone so far as to specifically warn investors about theses exact type of promoters as an indication of **micro-cap fraud**.

- 57 -

2. Documents indicate that Aron Govil is paying this same promote SCS to promote Cemtrex via wire transfers from an undisclosed entity in New York. The paid promotion by Cemtrex insiders has not been disclosed to Cemtrex investors. In the past, I have seen numerous examples[3] of other companies engaged in similar undisclosed paid promotions that resulted in Federal charges or lawsuits for **securities fraud**.

3. As the share price has soared due to promotion, documents show that shares held by Cemtrex insiders (Aron Givil, Saagar Govil and CFO Dela Rama) have been decreasing substantially during 2016, yet **Cemtrex insiders have failed to disclose any sales on Form** 4s during 2016. On places like Twitter, the Govils continue to tout the stock, encouraging retail investors to buy.

4. The controlling partner behind Cemtrex's auditor was banned by the SEC and PCAOB for conducting **fraudulent audits** or reviews of public companies while performing little or no work and without even being licensed. Cemtrex's auditor continues to claim that the firm is run from an office in Texas. But **photos** show that this address traces to a long-since **vacant strip mall**. The audit firm is **not even licensed** to practice in Texas. The only listed phone number in the US has been disconnected. That partner has repeatedly audited public companies under the guise of differently named audit firms, which have then been shut down. When one audit firm gets shut down, he has **repeatedly** created new ones and then audits the **same clients**, using the **same personnel**, reporting the **exact same address** in Texas. Cemtrex's prior auditor was **shut down by the PCAOB** and is now classified as a "prohibited service provider". Despite having revenues of nearly $100 million and operations in four countries across three continents, Cemtrex has only paid these auditors a mere $15,000-20,000 per year to "audit" its complex financials.

5. The investment banks and IR firms hired by Cemtrex (including Source Capital) have repeatedly represented other heavily promoted companies that have been promoted by SCS or other promoters. There has been long running and significant involvement with companies, individuals or activities implicated in **securities fraud**.

184.    The article went on to note the controlling interest held by A. Govil and the fact that A. Govil appointed his inexperienced son, S. Govil, to various executive and board positions at Cemtrex, including as the Company's CEO. Under the control of the Govils, Cemtrex also employed aggressive media relations firm to obtain positive media coverage around the Govils and Cemtrex. Specifically, the article stated:

---

[3] In original, underlined words link to various websites.

With Cemtrex, there is a reason why the numbers appear to be "too good to be true". There is a reason why there has been a surge of glowing media articles touting Cemtrex and its management. And there is a reason why **the stock keeps selling off** even when supposedly good news is released.

**There are clear reasons why hundreds of small retail investors have been duped into buying the stock and these are all thoroughly debunked and exposed below.**

*Company overview*

***

Cemtrex was founded 15 years ago by Aron Govil. Govil also runs Ducon Technologies, which operates out of the same address as Cemtrex and which owns Cemtrex shares. Through is personal and Ducon holdings, **Aron Govil is the largest shareholder in Centrex**.

In 2008, Govil appointed his **23-year old son**, Saagar Govil, into various executive and board positions at Cemtrex. Young Saagar had just undergraduated from undergrad that same year in 2008, with **no prior reported work experience**.

Just two years later, at the **age of 25, Saagar was appointed CEO** of Cemtrex and father Aron took the role of executive director and board member. Following the appointment of Saagar Govil as CEO, Cemtrex quickly embarked upon a slew of acquisitions, primarily of obscure companies in foreign countries well outside of the US.

Cemtrex has employed an aggressive IR and media relations firm to obtain an avalanche of positive media coverage around the Govils and Cemtrex. Saagar has recently been the subject of a flood of glowing media attention due to his young age and the apparent rapid growth of Cemtrex's revenues.

Between 2012 and 2016, reported revenues grew from $12 million to $94 million, largely driven by acquisitions of insolvent companies in overseas markets, which then contributed heavily to Cemtrex's results as soon as they were acquired.

185.    The article provided its "Key points underlying fraud thesis":

**Again, based on my past experiences and observations, I believe that there is a very strong chance that Cemtrex gets delisted outright and will go to zero.**

The key points I will address are as follows:

- **Point #1 – The massive paid by promotion, secretly paid by Cemtrex management**

- 59 -

- **Point #2 – Cemtrex insiders make undisclosed sales while pushing retail investors to buy**
- **Point #3 – Cemtrex's defunct auditor gone missing, history of fraud**
- **Point #4 – The third-party service providers**
- **Point #5 – Financial and disclosure "irregularities" and inconsistencies**

186.    Addressing "Point #1 – The massive paid by promotion, secretly paid by Cemtrex management," the article detailed how A. Govil secretly paid, through an undisclosed "inactive" entity called Southern Steel & Construction Inc., over $1 million to stock promoters to promote Cemtrex stock. Among the stock promoters paid by A. Govil was SCS, which "has been behind dozens of imploded stock promotions including a number of high profile frauds which were halted and/or delisted by the SEC." As revealed by the article, the "aggressive paid promotions" successfully "took the [Cemtrex] stock from below $1.70 to over $7.00 in 2016." In particular, the article stated:

In 2016, the SEC put out an Investor Alert Bulletin entitled: <u>Fraudulent Stock Promotions</u>.

In this, it warned that:

"Be especially cautious regarding stock promotions if there are any warning signs of microcap fraud including:

- The SEC suspended public trading of the security or other securities promoted by the same promoter.
- Increase in stock price or trading volume linked to promotional activity. …"

This is **precisely** what we see with Cemtrex and the promotions being run by a firm known as Small Cap Specialists (aka "SCS"). SCS has been behind dozens of imploded stock promotions including a number of high profile frauds which were **halted and/or delisted by the SEC**.

SCS happens to be the **exact same promotion firm** that **Aron Govil is paying** under an undisclosed entity **name** to run a pump campaign on Cemtrex. SCS has now been promoting Cemtrex for over one year. During that time, the share price quadrupled.

***

- 60 -

**First**, I will show how SCS repeatedly runs paid promotions on fraudulent companies, which are then halted and/or delisted.

**Second**, I will show the **documents** which show that Aron Govil is paying SCS to promote Cemtrex, using an undisclosed entity name.

And in the **next section**, I will then show how **Cemtrex insiders are secretly selling shares** during the paid promotion campaign, without disclosing the sales to investors.

187.    The Pearson Exposé provided specific evidence of paid promotions on the

Company, stating, in relevant part:

Evidence of various paid promotions on Cemtrex along with the payments involved can be found at promotion tracking sites such as Hotstocked.com and StockPromoters.com.  But these sites typically only capture a fraction of the promotions under way.

As we can see from these sites, a well-oiled stock promotion machine began aggressively pumping Cemtrex through a wide variety of online channels.  So far, **over $1 million has been paid to stock promoters**.

**I include a partial screen shot showing various paid promotions on Cemtrex at the bottom of this section, or just click the links above.  Here are just a few of the examples.  There are dozens and dozens more, each of which tend to cost from $10,000 to $50,000 a pop.**

I will demonstrate below that Aron Govil is behind Southern Steel & Construction which is paying SCS.  SCS has been responsible for numerous paid promotions on Cemtrex.

investment advisors. SCS LLC has been compensated thirty thousand dollars' cash via bank wire by Southern Steel and Construction, Inc. for two to three days' coverage of CETX. Investing in micro-cap and growth securities is highly speculative

**Compensation:** SCS LLC has been compensated thirty thousand dollars' cash via bank wire by Southern Steel and Construction, Inc.
**Date:** 10/13/2016  View: ✉️  Share: 📘 🐦

Schedule 13D. SCS LLC is compliant with the Can Spam Act of 2003. SCS LLC has been compensated twenty thousand dollars cash via bank wire by Star Media LLC for a two day investor relations/ media campaign of CETX. SCS LLC does not hold any positions in CETX securities. SCS LLC does not offer such

**Compensation:** SCS LLC has been compensated thirty thousand dollars' cash via bank wire by Southern Steel and Construction, Inc.
**Date:** 10/13/2016  View: ✉️  Share: 📘 🐦

- 61 -

**Compensation:** SCS LLC has been compensated ten thousand dollars' cash via bank wire by Third Coast media LLC for a one day update for investor relations and media services of CETX on 08/08/2016.
**Date:** 8/8/2016    View: ✉    Share: f 🐦

**Compensation:** SCS LLC was previously compensated by Star media LLC a total of twenty five thousand dollars cash via bankwire for the mention of CETX however SCS LLC has NOT been compensated for this correspondence.
**Date:** 6/6/2016    View: ✉    Share: f 🐦

**This aggressive paid promotion is what took the stock from below $1.70 to over $7.00 in 2016.**

(For more details on the past frauds or promotions by SCS which were halted, delisted or imploded, see Appendix A)

*Aron Govil's hidden paid promotion using SCS promoters*

Here is just one example of an SCS promotion of Cemtrex which was paid for by an entity called "Southern Steel and Construction".  This promotion was dated October 2016, but it notes that **SCS had been covering Cemtrex for a full-year prior.**

**We can see below that just two or three days coverage cost "Southern Steel" $30,000, which was paid via bank wire.**

(Note: This single payment to SCS for just 2-3 days of stock promotion is more than all the audit fees paid to its auditor Bharat Parikh for the full year for any of the last three years!)

**The SCS promotion beings with:**

"Good morning everyone.  This week's featured profile is one of our favorite small caps since our initial **coverage in October 2015**.  Cemtrex, Inc. (CETX) CETX has been an amazing growth story through organic and acquisitions since **our initial coverage last year**.  We are excited about what may be in store for this company going forward.

**Here is a screenshot noting payment of $30,000 by Southern Steel for just 2-3 days coverage:**

investment advisors. SCS LLC has been compensated thirty thousand dollars' cash via bank wire by Southern Steel and Construction, Inc. for two to three days' coverage of CETX. Investing in micro-cap and growth securities is highly speculative

188.    The Pearson Exposé presented findings concerning Southern Steel, stating, in relevant part:

**So just who is Southern Steel?**

**The only individual identified on a search from the <u>New York Department of State</u> is Aron Govil at 19 Engineers Lane (which is Cemtrex's address).**



**First of[f]....** so New York's corporate records for Southern Steel, which is paying for Cemtrex promotions by SCS, lists only Aron Govil at the same address as Cemtrex.

**And then second....** Southern Steel's entity status is listed as "inactive," meaning that since August 2016, it has engaged in little or no other business activity other than paying SCS to promote Cemtrex.

In fact, this information is a bit difficult to find.  By default, the NY State database only shows "active" corporations.  So when searching for this, one must opt to explicitly search for "all" corporations, both Active and Inactive.

**Again, this is just a single example of a paid SCS promotion.**

189. Addressing "Point #2 – Cemtrex Insiders make undisclosed sales while pushing retail investors to buy," the Pearson Exposé noted that, while none of the management members has filed a single Form 4 to disclose any share sales, "the number of shares held by A. Govil, S. Govil and Rama have all decreased significantly." According to the article, the total decrease in the shares of these three Defendants in 2016 "amounts to nearly 1 million," or "as much as $7 million in proceeds." Moreover, the article noted that non-managing directors Patel and Shah failed to file required Form 3s with the SEC disclosing their initial ownership interests in the Company, as required by the Exchange Act. For this reason, it would be impossible to tell if Patel and Shah have also engaged in undisclosed insider sales. The article's analysis concerning the secret insider sales engaged in by certain of the Individual Defendants was presented as follows:

> When a corporate insider makes sales of their own stock, this is very material information to outside shareholders because presumably insiders know much more than the rest of us. When an insider (management figure, director, or 10% holder) makes an initial purchase, that insider is **REQUIRED** to report the transaction on SEC Form 3.

> Subsequent transactions by such insiders (either buys or sells) are then **REQUIRED** to be reported on SEC Form 4. The Form 4s are very important because they **REQUIRE** the insider to disclose:

> - **the date of transaction**
> - **the number of shares transacted**
> - **the share price received**

> Retail investors in Cemtrex have tried to remain confident under the assumption that management is holding strong and not dumping shares.

> Precisely during the time of the paid promotion campaign, and along with the soaring share price, the number of shares held by Aron Govil, Saagar Govil and CFO Renato Dela Rama have all decreased significantly. The total decrease in their shares amounts to nearly 1 million shares, amounting to as much as $7 million in proceeds in 2016. You can do the math yourself: During 2016, Cemtrex's share price ranged from $1.65 to $7.38.

> **Yet no Form 4s have been filed to disclose any share sales from any Cemtrex insiders whatsoever. Here is a link to all of <u>Cemtrex's SEC filings</u>.**

It truly defies all common sense that **ALL members of management** had their shareholdings decline substantially while precisely **NONE** of them has filed a single Form 4 to disclose it.

For those who wish to double check for themselves, here are the reference SEC filings.

Ducon Tech Form 4 filed 2015

Cemtrex Proxy filed 2016

Cemtrex Proxy filed in 2017

The table below shows the number of shares held as of each of those dates.  We can see that for each of Ducon, Aron Govil, Saagar Govil and Renato Dela Rama, **the number of shares has declined substantially.**  For the directors, we do not know, because they never filed the required Form 3s to disclose their ownership.

*(click to enlarge)*

| Shares held as of | Form 4 Filed 2015 | Proxy Filed 2016 | Proxy Filed 2017 | New Shares Awarded | CHANGE IN SHARES HELD | Proceeds @$7.00 |
|---|---|---|---|---|---|---|
| Ducon | 433,219 | | 102,951 | | -330,268 | $ 2,311,876 |
| Aron Govil | | 3,405,000 | 3,182,951 | | -222,049 | $ 1,554,343 |
| Saagar Govil | | 1,333,334 | 1,433,334 | 400,000 | -300,000 | $ 2,100,000 |
| Renato Dela Rama (CFO) | | 66,667 | 46,834 | | -19,833 | $  138,831 |
| Sunny Patel | | | 6,722 | ???? | ???? | ???? |
| Shamik Shah | | | 5,417 | ???? | ???? | ???? |

190.    The Pearson Exposé then discussed Ducon and certain of the Individual Defendants' stock holdings in Cemtrex, stating, in relevant part:

***Ducon Technologies***

- 65 -

In November of 2015 (**exactly when the paid promotion from SCS began**), Ducon Technologies disclosed a **purchase** of 65,732 shares at a price of $2.55 for a total amount of $167,617.  As disclosed, this took Ducon's holding of Cemtrex common stock to a total of 433,219 shares.  Ducon Technologies is controlled by Aron Govil, who is behind the entity paying for the undisclosed stock promotion.

But according to the most recent Proxy filed in January of 2017, Aron Govil's Ducon Technology now only has 102,951 shares.  It, therefore, got rid of 330,268 shares during 2016.  Because there were no Form 4s filed, we don't know the dates or the amounts of any sales.  But we can see that the share price ranged from below $2 to above $7 in 2016.  Therefore, depending on when its shares were sold, Ducon Technology could have sold up to $2.3 million.

*Aron Govil*

By comparing the proxies issued in 2016 and then 2017, we can also see that shares held under Aron Govil's own name declined by 222,049 shares in 2016. Again, depending on when these were sold, they could have been worth up to $1.8 million.

*Saagar Govil*

As we will see, Saagar Govil's share holdings increased by 100,000 during 2016. But during the year, he also awarded himself 400,000 new shares via option grants, such that his position should have increased by 400,000. So clearly his net position actually declined by 300,000 shares.

For Saagar Govil, the 300,000 decline amounts to up to $2.1 million in 2016 assuming the sale of stock at share prices up to $7.00.

In September 2016 (with the stock having just hit new highs for the year), **Saagar Govil also purchased an upscale condo in New York valued at precisely $2.25 million.**

(The timing, the prices and the disclosure omissions around Saagar's 400,000 option grants also lead me to the question of if these were **backdated** to occur at **artificially low prices**. I will show the detailed documentation of in a section below).

\*\*\*

*CFO Renato Dela Rama*

Moving on, we can also see that the number of **shares held by the CFO also declined** by 19,833, again with no Form 4s being filed.  Depending on when the sale was made, this would have a value of up to $138,831 (or more than triple his reported salary).

*The Directors*

With directors Sunny Patel and Shamik Shah, we can see that both directors report owning a few thousand shares worth up to $30,000-40,000. But no initial Form 3s were ever filed to disclose when they received these shares or at what price. We also don't know **how many shares they initially received** in total, such that there may have been substantial selling here as well. Typically, new directors are awarded shares as of the date they join the board. For both of these directors, that would have been the spring of 2015. New shareholdings by directors are **ALWAYS** required to be filed to the SEC, but **NONE** were ever filed by these directors.

191.    Addressing "Point #3 – Cemtrex's defunct auditor gone missing, history of fraud," the article noted that Cemtrex was using an auditor controlled by a fraudster banned by the SEC and the PCAOB "due to accepting fees to provide fraudulent audits, and also for operating without a license to even provide audits at all." The auditor claimed to be "running out of a long-since vacant building" and listed a disconnected phone number on its website. More mysteriously, as a company that generates revenues of nearly $100 million through four international subsidiaries spanning three continents, Cemtrex only paid its auditor $20,000 for its audit work in each of the years 2015 and 2016. In year 2014, the audit fees amounted to just $15,000. The plausible explanation was that the Company paid its auditor to "sign off on so-called 'audits' without actually doing any real work." Specifically, the article stated:

> Up through 2014, Cemtrex was using a defunct auditor called Li & Co. But Li & Co. was shut down by the PCAOB . . . . Following that, Cemtrex began using Bharat Parikh & Associates as an auditor . . . .
>
> We now encounter a host of problems:
>
> **First,** (obviously) the fact that Cemtrex's auditor claims to be running a busy audit firm out of a long-since vacant building in a strip mall is troubling. Likewise, the disconnected phone number is equally troubling.
>
> **Second,** <u>Texas State Board of Public Accountancy</u> has no record of Bharat Parikh even having a license to provide audits for public companies. Click the link above to search the database. Enter in any combination of Bharat+Parikh and/or BPA, etc. There is nothing.

**Third,** Bharat Parikh & Associates is actually controlled not by Mr. Parikh, but by Mahesh Thakkar who holds a 51% stake in the auditor. Thakkar was <u>banned</u> by the SEC and the PCAOB due to accepting fees to provide fraudulent audits, and also for operating without a license to even provide audits at all. At the time, he was running an audit firm under a different name (Thakkar CPA/The Hall Group). But it was actually operated out of the same address (4940 McDermott), with the same group of personnel auditing the same clients. It is no coincidence that past clients from that partner then ended up simply switching over to the "new" firm using the "new" name Bharat Parikh (i.e. Cemtrex's auditor) out of the same exact address. Thakkar has operated audit firms using multiple names, changing the name of the firm each time he gets shut down. Various names used by Thakkar include: The Hall Group, Thakkar CPA, and Bharat Parikh and several others. Most recently, he has attempted to use the name TMK LA (in which Mr. Bharat Parikh is listed as his partner).

**Fourth,** as we will see, Cemtrex pays this absentee auditor a mere $15,000-20,000 in audit fees per year, despite claiming revenues of nearly $100 million from operations which span four countries and three continents. As highlighted by CFO.com, smaller firms tend to pay roughly $5,000 in audit fees per million dollars of revenue. That should place Cemtrex at nearly $500,000 in expected audit fees (even without sprawling international operations).

***

So Bharat Parikh's controlling partner/predecessor was banned because on **35 separate occasions**, it did not prepare audit documentation, it did not have a partner even conducting audits and it **falsely attested that it had properly conducted audits**.

**Basically, Thakkar was getting paid small amounts of money to sign off on these audits without really doing any work at all!**

In addition, the firm signed off on audits in a company with which it clearly had a direct financial interest and was therefore not independent.

192.    The Pearson Exposé then discussed the relevance of the findings concerning Bharat

Parikh & Associates and Cemtrex, stating, in relevant part:

**Here is why this matters. (And this should become quite obvious).**

Cemtrex purports to generate revenues of nearly $100 million coming from four international subsidiaries spanning three continents. Presumably, this makes Cemtrex relatively complicated (**and expensive) to audit**. This audit then gets even more expensive when the company needs to **integrate ongoing acquisitions** of totally new businesses. Any realistic cost assessment of such audit work for any normal company could run as high as **$500,000 to $1 million**. Easily.

**Yet in Cemtrex's 10-K, we can see that paid its absentee Indian auditor a mere $20,000 to perform its audit work in each of the last two years! And in the previous year, audit fees amounted to just $15,000** . . . .

Even for a small company with operations in just a single city, no auditor can justify even preliminary work for just $15,000-20,000. For a company operating in four countries across three continents, this is just patently absurd. And it seems very consistent with the **history of Thakkar/Hall etc. signing off on so-called "audits" without actually doing any real work.**

\*\*\*

The Cemtrex financials signed off on by Bharat Parikh and CFO Dela Rama have now shown 20 straight quarters of apparent profitability and soaring revenues. This "success" has then been widely echoed and amplified by the aggressive stock promoters being paid by Aron Govil through an undisclosed entity. And this is exactly the formula which caused the stock to soar from below $2.00 to over $7.00 in 2016.

193.    Addressing "Point #4 – The third-party service providers," the Pearson Exposé noted the bankers and investor relations firms that Cemtrex utilized, and how they were tied to companies whose stock price skyrocketed due to excessive promotions only to later implode or be delisted due to fraud.  The article also discussed Cemtrex's investment bank Source Capital Group Inc.'s relationships to these bankers and investor relations firms and compared Cemtrex's promotion to others that Pearson had seen.  In particular, the article stated:

Whenever I come across another paid stock promotion, I always, always, **ALWAYS** know exactly what I will find next. Each of these companies relies on the **same third-party service providers such as law firms, investment banks and "IR firms"**. The world of small-cap stock promotion is basically a small country club and all of these guys know each other.

With Cemtrex, we can see that the company has relied heavily upon **Chardan Capital** and **Source Capital** as its bankers. **For IR, Cemtrex uses IRTH Communications**. Each of these firms will be detailed below. But it is safe to say that there is very notable overlap between the **client lists of all three firms**. They all work for many of the same firms and people. From there, we also see that **they also service the exact same companies which have been heavily promoted by the exact same stock promoters, including SCS, listed above**. In each case, these **client companies have then repeatedly imploded** or been halted or delisted due to fraud.

This raises two issues:

**First**, if the last 20 or so companies represented by these third parties generally skyrocketed due to excessive promotions and then imploded, it seems like a safe assumption for any objective investor to suspect that Cemtrex might do the same thing. This is just common sense.

**Second**, when this pattern of shareholder destruction is so obvious with their client lists, why on Earth would any company ever select these third parties to represent them (unless they simply had no alternatives, because they too were nothing more than a blatant stock promotion). Again, this is just common sense.

194.    The Pearson Exposé additionally discussed Source Capital and Cemtrex's recent

rights offering, stating, in relevant part:

### *Source Capital and Cemtrex's recent rights offering*

Cemtrex <u>relied</u> upon Source Capital Group to run its recent rights offering which was completed a few weeks ago in January, raising $13 million.

In February, just days after the completion of Cemtrex's rights offering, we saw the following headline:

"Goodman & Nekvasil, P.A. won a FINRA arbitration award against Source Capital Group on Feb. 3 while working on behalf of three retirees, William B. Lashlee and Keith and Joyce A. McCrea. Lashlee is an 88-year-old retired native of St. Simons Island, Georgia, and the McCreas are a retired couple who live in Yorkville, Georgia.

Both groups alleged they were sold unregistered and unsuitable investments in IPG stock by Joseph Hooper, who was working as a representative. Lashlee invested $220,000 and the McCreas invested $590,000 for a combined total of $810,000 in IPG stock."

IPG quickly went bankrupt and Source was found to have been negligent.

**As of last week (February 17th, 2017), we can see that Source Group had its FINRA registrations terminated in all states in which it was operating. FINRA notes that Source Group ceased business operations in February 2017.**

www.finra.org/brokercheck

User Guidance



**Firm Operations**

**Registrations (continued)**

| U.S. States & Territories | Status | Date Effective | U.S. States & Territories | Status | Date Effective |
|---|---|---|---|---|---|
| Alabama | Termination Requested | 02/17/2017 | Minnesota | Termination Requested | 02/17/2017 |
| Arizona | Termination Requested | 02/17/2017 | Mississippi | Termination Requested | 02/17/2017 |
| Arkansas | Termination Requested | 02/17/2017 | Missouri | Termination Requested | 02/17/2017 |
| California | Termination Requested | 02/17/2017 | Montana | Termination Requested | 02/17/2017 |
| Colorado | Termination Requested | 02/17/2017 | Nebraska | Termination Requested | 02/17/2017 |
| Connecticut | Termination Requested | 02/17/2017 | Nevada | Termination Requested | 02/17/2017 |
| Delaware | Termination Requested | 02/17/2017 | New Hampshire | Termination Requested | 02/17/2017 |
| Florida | Termination Requested | 02/17/2017 | New Jersey | Termination Requested | 02/17/2017 |
| Georgia | Termination Requested | 02/17/2017 | New Mexico | Termination Requested | 02/17/2017 |
| Hawaii | Termination Requested | 02/17/2017 | New York | Termination Requested | 02/17/2017 |
| Illinois | Termination Requested | 02/17/2017 | North Dakota | Termination Requested | 02/17/2017 |
| Indiana | Termination Requested | 02/17/2017 | Ohio | Termination Requested | 02/17/2017 |
| Iowa | Termination Requested | 02/17/2017 | Oklahoma | Termination Requested | 02/17/2017 |
| Kansas | Termination Requested | 02/17/2017 | Oregon | Termination Requested | 02/17/2017 |
| Kentucky | Termination Requested | 02/17/2017 | Pennsylvania | Termination Requested | 02/17/2017 |
| Maine | Termination Requested | 02/17/2017 | Puerto Rico | Termination Requested | 02/17/2017 |
| Maryland | Termination Requested | 02/17/2017 | Rhode Island | Termination Requested | 02/17/2017 |
| Massachusetts | Termination Requested | 02/17/2017 | South Carolina | Termination Requested | 02/17/2017 |
| Michigan | Termination Requested | 02/17/2017 | South Dakota | Termination Requested | 02/17/2017 |

©2017 FINRA. All rights reserved.   Report about SOURCE CAPITAL GROUP, INC.

9

From Source's underline{website}, we can see that the firm has raised money for a number of other heavily promoted microcaps which then imploded. Like Chardan below, this includes a number of tiny Chinese reverse mergers which were delisted (but only after they raised substantial capital from US investors).

My regular readers will remember back when I previously <u>exposed</u> a massive stock promotion ring run by "**The Dream Team Group**", which also operated under the name of **Mission IR**. Dream Team/Mission IR had recruited numerous authors to write extensive undisclosed paid promotions on dozens of micro-cap stocks. These authors would pretend that they were industry experts or hedge fund managers and would write aggressive articles recommending the client stocks. These stocks then soared in price, allowing the companies and their management to sell stock at inflated prices. **After my expose, each of the implicated companies ended up plummeting by as much as 95%, and a number of civil suits and SEC investigations ensued.**

**Dream Team/Mission IR were the architects behind a widespread ring of stock fraud and promotion. I even produced the internal documentation to prove it.**

- 71 -

Here, we can see that Mission IR lists Source Capital as its "conference partner". Here we can also see Mission IR promoting Source Capital's "Disruptive Growth Conference".

Note that a number of the companies which attend Source's investor conference also happen to be banked by Chardan and/or are clients of IRTH Communications as well. These attendees of Source's disruptive growth conference also happen to be heavily promoted by the same promoters listed above, including our favorite, SCS. This is easy to see by logging on to either Hotstocked.com or StockPromoters.com.

At FINRA's Broker Check website, we can also see where Source was fined by FINRA for having sold investments to investors "**without disclosing material facts**" and sold investments by making "**exaggerated promises** in multiple emails" as well as selling securities "**at prices which were not fair**".

Either way, following the termination of its FINRA registration in all states, it appears that Source Capital is no more.

195.    The Pearson Exposé also examined the Company's chosen banker to run its S-3

offering, stating in relevant part:

### Chardan Capital Markets

Cemtrex retained banker Chardan Capital Markets to run its S-3 offering in 2016. Cemtrex was then forced to withdraw the offering **because Cemtrex did not meet the requirements as a result of failing to file required SEC documents.**

Chardan and its management have a long history of run-ins with the SEC and FINRA. This includes various reports of manipulating small-cap stocks, insider trading activity, failure to disclose various stock holdings and transactions as well as defrauding the US Small Business association out of $35 million. Chardan then launched into the Chinese Reverse Merger/SPAC game. Geoinvesting subsequently highlighted no less than 17 different examples of Chardan Chinese reverse mergers/SPACs, the majority of which completely imploded following exposure of or allegations of fraud.

196.    The Pearson Exposé also examined the Company's chosen investor relations firm,

stating, in relevant part:

### IRTH Communications - Cemtrex's "IR" firm

Cemtrex's IR firm is IRTH Communications. **As with Source Group above, IRTH is listed as an IR partner of Mission IR (aka the Dream Team Group)** which was found to be behind a massive illegal stock promotion ring.





IRTH Communications provides investor relations, financial communications, and strategic consulting services to companies focusing on alternative energy, clean and renewable technology, natural and organic products, and socially responsible activities. The company is dedicated to helping entrepreneurs, corporate executives, and investors to realize their visions and achieve their goals by delivering effective communications and investor relations services.

For more information please visit www.irthcommunications.com

> As shown on its website, IRTH has been responsible for various aggressive media placement campaigns for its clients, getting the stocks and their management strong **favorable mentions in mainstream media outlets**.
>
> But as we can see below, many of these stocks are the same stocks that have been heavily promoted by the promoters listed above, **including our favorite, SCS**. These stocks have then eventually **imploded** despite tremendous positive coverage generated by IRTH.
>
> **Many retail investors have been lured into buying Cemtrex stock solely as the result of seeing these high profile, positive media placements on Cemtrex which have been entirely arranged on their behalf.**

197.    The Pearson Exposé then noted situations similar to Cemtrex's that the author had

seen in the past, stating, in relevant part:

> As for the glowing media coverage that has suddenly exploded upon Cemtrex and the Govils, this is something that I have seen on many occasions.

For example, in January of 2011, China Media Express (formerly CCME) obtained the following headline from none less than Forbes:

China MediaExpress Holdings, Inc. Ranked #1 in Forbes China List of Small-to-Medium Sized Chinese Companies with the Greatest Potential

Just **60 days later, CCME was delisted** when it was uncovered as an **abject fraud**. Thanks Forbes.

In the US, the micro-cap Organovo (NYSEMKT:ONVO) shot up 3.5x from $4.00 to $14.00 following the publication of this article in Popular Science, which was a full feature on that microcap stock filled with hype and hyperbole.

How 3-D Printing Body Parts Will Revolutionize Medicine

Organovo subsequently fell from $14.00 to its current levels of $2-3 when it became apparent that the "3D printing of body parts" was pure fantasy. Thanks Pop Sci. In these cases above, there is certainly no evidence that this coverage was paid for. However, it has been my observation that anyone can obtain glowing media coverage if enough money is paid to a PR/IR/Media agency. Given that millions of dollars have already been paid to stock promoters, it should come as no surprise that aggressive media placements have proliferated covering Cemtrex and the Govils. IRTH was founded by brothers Andrew and Robert Haag. The Haag Brothers had both previously worked for small-cap investment bank Auerbach, Pollak & Richardson. Auerbach folded in 2001 after its securities registration was revoked following a variety of regulatory violations. In 2002, Andrew Haag then went to work as CFO and director of microcap reverse merger Quintek Technologies, a former Auerbach client. In 2002, Quintek's CEO was sanctioned by the SEC for having put out a variety of false and misleading press releases regarding phony purchasing orders, causing the stock to soar dramatically, coincidentally just as the company was looking to raise money. Haag stayed on with Quintek until 2008. He notes that as CFO, he "Raised $5 + million in capital, Increased Valuation + Liquidity, Expanded Shareholder Base 10 fold, Responsible for Cash Management, Responsible for Public Filings, Corporate Development". But we can see that by 2008, the SEC was already hounding Quintek for putting out delayed financials which contained material inaccuracies (i.e. just like Cemtrex). These financials then needed to be publicly restated. As CFO, Hagg stated to the SEC that he would be retaining a PCAOB audit firm to rectify the inaccuracies in the financials. But instead, the members of management simply resigned and Quintek stopped making further SEC filings. Quintek just went dark leaving investors with nothing.

Following the implosion of Quintek, Haag and his brother then founded Hampton Growth Capital which focused on "**Investor Relations**" and "**Capital Formation**". Like Chardan and Source above, Hampton placed a heavy focus on servicing Chinese reverse mergers, helping to promote them so that they could raise money from US investors. By 2011, following the wave of fraud among Chinese reverse mergers, Hampton's Chinese reverse

merger clients had been completely delisted. With Hampton in disgrace, the Haag brothers then ceased using that name began using a new name, "IRTH Communications", and promoting US-based micro caps.

Below, you can see the stock performances of some clients of IRTH Communications. You can see that most of these have imploded by as much as 90% from their highs following the promotion.

For those who wish to check on their own, you can see that most of these IRTH clients happen to also have been the subject of heavy paid promotion including via our favorite promoter group SCS. Checking this is easy by simply going back to Hotstocked.com or StockPromoters.com.

198.  Addressing "Point #5 – Financial and disclosure 'irregularities' and inconsistencies," the article noted that the Company's SEC filings have always been late, inaccurate, or contained "blatant inconsistencies." The article further raised concern over the fact that the Company was overseen by young and inexperienced directors. The article stated, in relevant part:

> Given the state of Cemtrex's auditors and bankers, seeing blatant errors, "**irregularities**" and **inconsistencies** should come as no surprise. But as I have shown repeatedly in past articles, when we see such repeated irregularities in a company's SEC financials it generally presages an implosion in the share price and/or a delisting of the stock.

> Again, here is a link to all of <u>Cemtrex's SEC filings</u>.

> Anyone who has performed a detailed review of Cemtrex's SEC filings should know that Cemtrex tends to play very fast and loose with its SEC reporting requirements.

> The filings that Cemtrex is required to make have been **late**, they have been **inaccurate**, there have been **blatant inconsistencies** between various filings that are never reconciled.

> This includes even the most major filings such as the annual 10-K and the Proxy. Cemtrex originally filed its previous 10-K filing in December of 2015. Almost 9 months later, it was still <u>filing amendments</u> and **corrections** to correct blatant errors in that filing. The mistakes included very major items, such as the details of its **liquidity position**, as well as many minor items such as various spelling and grammatical mistakes which should never be found in a 10-K.

> The **delayed and inaccurate filings** are the reason why Cemtrex was **forced to cancel its S-3 equity offering** in 2016, which was being run by Chardan Capital. Instead, Cemtrex

- 75 -

was then forced to conduct a much more lenient rights offering, which would then be run by Source Capital Group. Rights Offerings can be completed even by those companies who become ineligible to do an S-3 offering.

Because of this negligence/omission in SEC filings, Cemtrex was forced to disclose in the most recent 10-K that:

"We **did not timely file with the SEC** ((i)) our definitive **proxy statement**, which includes the information required by Part III of **Form 10-K**, within 120 days of our fiscal year ended September 30, 2015, (ii) our **Form 8-K in relation to our meeting of shareholders** held on March 7, 2016, or ((iii)) **several other current reports** filed during the preceding 12 calendar months. **All of these reports were ultimately filed**, but their lateness caused us to become **ineligible to use Form S-3,** a shorter registration statement that is often used for "shelf" registrations. If we are not able to file our current and periodic reports and other documents with the SEC in the future in the times specified by the Securities Exchange Act, we will continue to lose our eligibility to use Form S-3 for future capital raises, and that could impair our ability to conduct more efficient and expeditious public offerings of our stock off of shelf registrations. **Our inability to timely file current and periodic reports in the future could materially and adversely affect our financial condition and results of operations.**"

199.    The Pearson Exposé then discussed issues with the Company's directors, stating,

in relevant part:

*Cemtrex directors*

Separately, we can also see that Cemtrex's outside board members consist of Shamik Shah and Sunny Patel. Both of these individuals are young hedge fund traders who focus on trading stocks, futures and/or derivatives. They show **no experience in anything related to running a public company**, engineering or environmental controls or accounting issues. They have no business being directors of Cemtrex, aside from potentially around issues regarding trading the stock.

Just like Saagar Govil, we can see that **30-year old <u>Shamik Shah</u>** went to school in New York and graduated with his undergrad degree at exactly the same time as **Saagar Govil in 2008**.

Director <u>Sunny Patel</u> is also now **30 years old** also graduated from the same school in New York in 2008 and also worked as a derivatives trader with a hedge fund.

Just like Saagar Govil, these two were brought on as directors for Cemtrex despite having no relevant work experience. Both Shah and Patel were appointed as directors in April and May of 2015. That happened to be precisely when Cemtrex was <u>applying to uplist</u> from the OTC BB to the NASDAQ. As part of that process, the company is required to have outside

board members, which is why Cemtrex appointed these two then 28-year olds with no relevant experience those roles. By fulfilling this simple requirement, Cemtrex was then able to uplist to the NASDAQ just a few weeks later.

***

*Appendix B – Additional Cemtrex promotions*

Here is a partial screenshot showing just a few of the recent promotions, click the links above to see dozens and dozens more.   I encourage interested readers to go to Hotstocked.com or StockPromoters.com to read more examples.



**Stocks Promoted : 37 Total**      *Displaying top* 50      Viewing 1-37

| Company: | Cemtrex Inc. ( CETX ) | | |
|---|---|---|---|
| End of Day: | $ Close: | 5.940 | Volume: | 618,609 |
| | Intraday High: | 6.150 | % Change: | -2.142 |
| | $ Change: | ▼ -0.130 | $ Volume: | 3,674,537 |
| | $ Open: | 6.000 | | |
| | $ Previous Close: | 6.070 | | |
| 3 Month: | $ High / Low | 8.410 / 4.010 | Volume 3m avg: | 568,902 |

Promoter: Small Cap Traders 👤
Compensation: SCS LLC has been previously compensated by Southern steel and construction thirty thousand dollars cash via bank wire for coverage of CETX but not for this particular correspondence. SCS LLC has not been compensated for the mention of pure energy minerals, CVE: LIX, ASX: DKO or Tesla Motors.
Date: 2/13/2017  View: ✉  Share: f 🐦

| Company: | Cemtrex Inc. ( CETX ) | | |
|---|---|---|---|
| End of Day: | $ Close: | 5.130 | Volume: | 779,151 |
| | Intraday High: | 5.400 | % Change: | 1.584 |
| | $ Change: | ▲ 0.080 | $ Volume: | 3,997,045 |
| | $ Open: | 5.150 | | |
| | $ Previous Close: | 5.050 | | |
| 3 Month: | $ High / Low | 5.400 / 3.750 | Volume 3m avg: | 204,693 |

Promoter: Small Cap Leader 👤
Compensation: Smallcapleader.com has been compensated fifteen thousand dollars by a third party(TSX Ventures) for an investor awareness campaign regarding CETX. Smallcapleader.com has previously been compensated sixty five thousand dollars for investor awareness campaigns regarding CETX, which have expired..
Date: 12/14/2016  View: ✉  Share: f 🐦

| Company: | Cemtrex Inc. ( CETX ) | | |
|---|---|---|---|
| End of Day: | $ Close: | 5.050 | Volume: | 1,479,871 |
| | Intraday High: | 5.050 | % Change: | 16.359 |
| | $ Change: | ▲ 0.710 | $ Volume: | 7,473,349 |
| | $ Open: | 4.430 | | |
| | $ Previous Close: | 4.340 | | |
| 3 Month: | $ High / Low | 5.190 / 3.750 | Volume 3m avg: | 193,882 |

Promoter: Small Cap Leader 👤
Compensation: Smallcapleader.com has been compensated fifteen thousand dollars by a third party(TSX Ventures) for an investor awareness campaign regarding CETX. Smallcapleader.com has previously been compensated sixty five thousand dollars for investor awareness campaigns regarding CETX, which have expired..
Date: 12/13/2016  View: ✉  Share: f 🐦

***The Unemon1 Blog Posts***

200.     On February 22, 2017, at 10:23 AM EST, the first of the Unemon1 Blog Posts was published on *Seeking Alpha*.  The blog post, titled "Is India The New China For Stock Scams?

CEMTREX Inc Warrants A SEC Investigation And Delisting. CETX Lied About Ownershp [sic] In Its Filings.,” highlighted the Company's false claim of ownership of Cemtrex India.  The blog post stated, in relevant part:

**CETX … this is BAD …really Bad! Claiming false Ownership Makes you realize SEC filings cannot be relied Upon! This sounds Like China All Over Again!!**

*** 

While in its SEC Filings Cemtrex Inc (NASDAQ:CETX) claims 100% ownership in *Cemtrex India Private Limited*, evidence collected from the Indian Ministry of Corporate Affairs suggests/proves CETX ownership in *Cemtrex India Private Limited* is (and has been) 0%. Cemtrex India Private Limited is majority owned by Aron Govil personally (the father of Saagar Govil, the current CETX Ch/Pres/CEO/IR)

**++ Bonus**: the Auditors' Accountant (Oct 3rd, 2016) for *Cemtrex India Private Limited* used to be (till Sept 30, 2016) a Director at Ducon Infratechnologies (Indian Listed Company controlled by Aron Govil) and it also used to work at Sandeep Parikh's (Govil Business Partner and *Cemtrex India Private Limited* 5% Shareholder) Accounting Firm P. Parikh and Associates (License Revoked in 2013). **HOW SICK IS THAT?**

CETX. might try to say Cemtrex India Private Limited is a marginal Part of the Business? I do not care, to me this evidence shows Co. cannot be trusted. Auditor should Resign and Nasdaq should intervene.

**Does CETX really own Cemtrex India Private Limited? Unfortunately this does not Seem the Case!**

CETX  SEC Filings Claim CETX is the 100% owner of *Cemtrex India Private Limited*.

From 10-Q for the Period ended December 31, 2010 ( page 6):

*"The Company has also set up a subsidiary **Cemtrex India Pvt. Ltd**., located in Mumbai, India to sell emission monitors and related industrial equipment."*

From 10-Q for the Period ended December 31, 2010 ( page 6):

*"The accompanying **consolidated financial statements**\* include the accounts of Cemtrex, Inc. and its wholly subsidiaries Griffin Filters, LLC and **Cemtrex India Pvt. Ltd**., (collectively the "Company")."*

\*How can CETX consolidate something that it does not own? Did they take some accounting lessons from Puda Coal Chairman … Ming Zhao?

***

According to Documents filed with the " <u>MINISTRY OF CORPORATE AFFAIRS</u> <u>(Government of India)</u>", Cemtrex Inc is not the Shareholder of Cemtrex India Private Limited (therefore CETX SEC filings cannot be relied upon).

201.   The first Unemon1 blog post additionally pointed out issues with Ducon, stating,

in relevant part:

### 2 Listed Companies Exposed in one single Blog Post?

Investors should also be looking into at <u>Ducon Infratechnologies</u> (Indian Listed Company controlled by Aron Govil).

In this Blog I already exposed the Relationship between Sandeep Parikh and Aron Govil … … but wait … … would you believe that at <u>Ducon Infratechnologies</u>(Indian Listed Company controlled by Aron Govil) appointed ( <u>2016 / page 3</u>) **P. Parikh & Associates (FRN 107564W)**, Chartered Accountants (Firm Registration No. 107564W) as the Statutory Auditors of the Company.

***

Company that got its Registration Revoked by the PCAOB in 2013 … … and that was founded by the father of Aron Govil's Business Partner (Sandeep Parikh and Aron Govil have equity interests in common companies [such as Cemtrex India Private Limited] and are directors of Common Companies [such as Cemtrex India Private Limited and/or ARUN GOVIL PRODUCTIONS PRIVATE LIMITED] ). Sandeep Parikh, in the last PCAOB document available was also listed as a Partner of **P. Parikh & Associates** (see above).So <u>Ducon Infratechnologies</u> (Indian Listed Company controlled by Aron Govil) appointed as Auditor a [sic]

A cautions investor would not feel very protected by this fact … … I would just run AWAY!!

**Cemtrex Inc** ( *up 147% in 1 year, was up 220% in Early January 2017*) and **Ducon Infratechnologies** ( *up 314% in one year*) … … have been pumped hard over the last 2 months … and this has contributed to make the Govil Family very wealthy "on Paper" … … **totaling approx. $70.18m**

Aron Govil + Saagar Govil Stake in CETX = 4,513,334 Shares at $5.77 = $26.04m

Aron Govil stake in DUCON IS= 47,190,552 Shares at 62.35 INR = $44.14m

- 80 -

**It's a bit Unfortunate that this is not going to last … market participants stupidity isn't infinite.**

202.    On February 22, 2017 at 10:52 AM EST, the second Unemon1 Blog Post was published on *Seeking Alpha*.  The blog post was titled, "CETX Is An Over-Leveraged Companies That Acquired Poorly Performing Businesses By Ramping Up Debt. The ROB Cemtrex GmbH Case: [sic]," and highlighted concerns regarding the financing of the Company's acquisitions.  The blog post stated, in relevant part:

> CETX has performed $24.9m worth of acquisitions and financed 17.3m of them with debt.
>
> Since 2013 CETX has performed $22.2m worth of acquisitions and financed only $5.9m of them with Equity, the remaining $16.3m has been financed by Debt.
>
> **Even Fundamentally CETX is a No Brainer STRONG SELL!** CETX has just been acquiring performing businesses and financing the transactions mostly with debt. Retail investors see revenue grow and therefore buy into the growth story touted by the management and online newsletters…. Unfortunately, shareholders fail to consider the fact that everyone can buy a 30-50 Revenue business for 1m USD (or even less) … if the business is in poor conditions. That's exactly what CETX has been doing. Let me give you an example (or maybe two):
>
> **Let's have a Look at Rob Group Assets Acquisition now operating under "Rob Cemtrex GMBH" Umbrella:**
>
>                       ***
>
> The Rob Cemtrex GmbH 2014 Net Income:
>
> From the 10-K for the Period Ending September 30, 2014 ( Page 15):
>
>
> "***Net income*** *for years ended September 30, 2014 and 2013 was $2,668,886 and $288,497, respectively,* ***an increase of $2,380,389, or 825%.*** *The net income percentage in the period as compared to the previous one* ***was higher as a result of the acquisition of ROB Cemtrex GmbH*** *and* ***execution of profitable environmental and filtration projects***"
>
> One page Later, CETX even stated that the Higher Net Income was due to the Acquisition of ROB Cemtrex Gmbh:" *Net income for the year increased, as compared to net income*

*for last year, due to higher overall sales due to the acquisition of ROB Cemtrex GmbH"* (10-K for the Period Ending September 30, 2014 ( <u>Page 16</u>)).

Since I am a Diligent Investor, I decided to pull the Rob Cemtrex Gmbh Financial Statements from Germany, and I noticed that the Net Income in 2014 had only be EURO 30,706 (About USD 39,000 the at the time prevailing FX Rate).

According to Cemtrex Inc SEC filings ( <u>Page 15</u>) Net Income in 2014 Increased by more than $2m + "*due to higher overall sales due to the acquisition of ROB Cemtrex GmbH* ( <u>Page 16</u>) … … yet German Filings for ROB Cemtrex GmbH show that Net Income was only EURO 30,076 …. PUZZLING!

I recognize that there can be some adjustments between German Accounting and the Accounting Standards used in the SEC filings … however the difference seems to be too big. And in any case, German Filings shows that Rob Cemtrex GmbH in 2014 barely broke even … while CETX tries to illustrate a thriving business in the SEC filings / Financials.

203.    The second Unemon1 blog post also noted Unemon1's distrust of the Company due

to its purported ability to constantly show growth, stating, in relevant part:

> **It is Great how CETX is always able to growth, no matter what. So unfortunate I do not trust this Company … AT ALL! I think I have provided enough evidence (also in the Cemtrex India Private Limited Blog post … about why I do not trust CETX and its Management Team)!!**

> **Has business at Griffin Filters LCC been shrinking over the year? It surely seems so!**

> <u>10-K for FY 2009 (page F-12)</u>: "The Company's subsidiary **Griffin Filters LLC leases approx. 10,000 sq**. ft. of office and warehouse space in Liverpool, New York from a third party in a five year lease at a monthly rent of $ 4,858.00 expiring on March 30, 2012."

> <u>10-K for FY 2014 (page F-20)</u>: "The Company's subsidiary Griffin Filters LLC leases approx. 5,000 sq. ft. of office and warehouse space in Liverpool, New York from a third party in a five year lease at a monthly rent of $2,200 expiring on March 31, 2018.". Leased Space was unchanged in the <u>10-K for FY 2016 (page F-25)</u>
> **It looks like that from 2009 to 2014 they have reduced the leased space by 50% … Not very indicative of a Thriving Business! Right?**

> **DO NOT TRUST ME … I MIGHT BE WRONG … DO YOUR OWN DUE DILIGENCE AND ACT CONSEQUENTLY. Of course, I am high conviction short into this opaque and for me not trustworthy Company!**

> **PS:**

If you want a to take a closer look at past CETX 10-Ks … you might find interesting the fact that from 2011 to 2013 a vast majority of the revenue (>70%) of the Company (back then it only had the MIP Division & Filters Segment) used to come from Ducon Technology Inc (Govil's other Company). Then all of a sudden, in 2014 the Revenue generated from sales to Ducon Technologies went to $0 (from$10.8m). However, CETX revenue in the Segment did not decline by a single penny. CETX did not even give any explanation about why this Change happened!

**Once CETX is over … I suggest Management starts a PR firm. They have been so good at issuing meaningless PR to promote CETX.**

204.    On February 21, 2017, the price per share of Company stock at the close of trading was $5.12.  On February 22, 2017, the day the Pearson Exposé was published, the price per share of Company stock at closing fell to $3.40.

*February 22, 2017 Press Release*

205.    On February 22, 2017, the Company issued a press release responding to the Pearson Exposé and the Unemon1 Blog Posts, stating one of the blog posts was "malicious" and contained "false and misleading information."  In the press release, Cemtrex continued to mislead the investing public, stating, in relevant part:

 As is easily confirmed by a review of Cemtrex's proxy filings with the SEC, Arun Govil and Saagar Govil have not sold shares of Cemtrex in several years. In addition, CEO Saagar Govil and Cemtrex Founder Arun Govil are committed to purchasing additional shares of Cemtrex in the open market and will file the appropriate Form 4's with the SEC accordingly in the days to come.

206.    The statement made in the press release was false and misleading because it was not true that Defendant A. Govil had not sold shares in years.  A. Govil's wholly-owned Ducon had sold hundreds of thousands of shares just months earlier, after A. Govil paid a stock promotion firm to inflate the Company's stock price.

*February 23, 2017 Conference Call*

207.     On February 23, 2017, the Company held a conference call wherein the Company contradicted itself while providing additional false and misleading information to the investing public.  During the call, Defendant S. Govil stated:

> You can see from the proxy statements of the company that no shares were sold by Arun or me, except for the shares sold by Ducon, an entity controlled by Arun in which he filed a Form 144, and it was disclosed and sold shares for Ducon in the ordinary course of business. Ducon also bought over 300,000 units of preferred shares on the same terms as all other investors in the recent rights offering.

208.     Thus, S. Govil contradicted the Company's statements made in the prior days press release and admitted to Defendant A. Govil's sales of hundreds of thousands of Company shares. Defendant S. Govil moreover falsely represented that Ducon had purchased over 300,000 units of preferred shares on the same terms as all other investors in the Company's recently completed rights offering, when in reality Ducon came to own the preferred shares by way of the conversion of the $3.4 million note provided to finance the Periscope acquisition.

209.     During the call, Defendant S. Govil also materially misrepresented the status of the Company's German EMS segment in relation to ROB Cemtrex's outlook as a whole and the automotive business:

> Cemtrex's electronics manufacturing services division has experienced dramatic growth this past year. Cemtrex's products are used in a variety of industries, including wearable devices, automobiles, telecommunications, industrial products, appliances, home automation, industrial automation, and medical devices. Many of our customers are an industry that are expanding rapidly [sic], and we expect to benefit from that growth. Cemtrex is focused on building relationships with market leaders and customers with high-growth potential in growing markets such as automotive electronics, medical devices, and wearables.
>
> In 2016, in our EMS division, we produced more than 300 different products for more than 50 customers, such as Harman International, AVB, and Schneider Electric. We have strengthened and grown our market share in Germany through the acquisition of Periscope. Periscope, now operating under our ROB Cemtrex brand, is focused on EMS for major

- 84 -

automotive producers, primarily Tier 1 suppliers as well as for, uh, telecommunications, industrial goods, luxury consumer products, display technology, and other OEMs.

Periscope has more than 35 years of operating experience under prior owners, like Siemens and Flextronics. The Periscope acquisition also gives Cemtrex a strong footing in the dynamic automobile industry, which is undergoing rapid technology change, with Cemtrex poised to be a significant beneficiary of this evolution and disruption. The automotive electronics market is expected to be 350 billion by 2023, up from 185 billion in 2015, according to Global Market Insights.

Our opportunities in this space reflect anticipated growth globally. New Venture Research predicts the EMS industry at 621 billion in 2019, up from 460 billion in 2014, as more companies rely on outsourcing electronics manufacturing. ECS Insights projects the wearable device market to reach 34 billion by 2020. IDTechEx forecasts it will reach 75 billion by 2025. Research in markets estimates that the industrial control and factory automation market will reach 20—uh, 200 billion by 2020, which represents an annual growth rate of 6 percent.

210.     Defendant S. Govil's comments were materially false and misleading because they omitted then-known issues with the Company's segment and issues with existing and new orders, which were consistent problems that would cause the Company to announce just a week later that it would be closing the facility it had just purchased months prior.

### The Closing of the Company's Paderborn, Germany Facility

211.     On February 28, 2017, the managing director of ROB Cemtrex informed the German works council and affected employees of Cemtrex's intention to close the Paderborn, Germany facility which housed ROB Cemtrex Automotive GmbH, which was acquired in the acquisition of Periscope GmbH just months earlier.

212.     On March 1, 2017, ROB Cemtrex sent a letter to its customers notifying them of the closing of the Paderborn plant.  The letter stated, in relevant part:

The background to this decision is basically reduced sales numbers and in particular the absence of new order business, which we were expecting to get for our plant in Paderborn. The permanent operation of our plant has become, under consideration of the achieved occupancy rate, economically impossible.

- 85 -

Our decision to close down our plant in Paderborn, after processing all existing orders, is therefore unavoidable. We would like to point out, that this decision was not easy to take for us. But we wanted to take it at a time, where we still see a chance to shape our business relation in accordance to our mutual interests.

### German Newspaper Reports Plans to Close Paderborn Facility

213.    On March 2, 2017, the German newspaper *Neue Westfälische* published an article reporting the Company's plan to close the Paderborn facility and lay off over 100 employees.  The managing director of ROB Cemtrex is quoted in the article, commenting on the reasons of the closing of the facility.  The article states,[4] in relevant part:

> The background to the decision was a sharp decline in sales and, above all, a lack of new orders." We had to take back the plans month after month. Now a level has been reached that makes a permanent operation economically impossible," said Bittighofer.

> In Paderborn, electronic parts are mainly produced for suppliers to the automotive industry and telecommunications companies. Particularly affected by the announcement of one of the key customers to suffer even a massive slump in demand for telephone equipment and accessories. Managing Director Bittighofer: "The ongoing technology change in this sector does not allow any significant new orders to be expected. Adding to that is a heavy price pressure."

> In the medium term, this cannot be offset by other production orders. In addition, there would be political risks for the overall economy; Therefore, other customers are cautious about new projects. Against this background, ultimately, the decision to close the Paderborn plant after processing the existing orders is inevitable. Bittighofer: "This step is not easy for us. However, we also wanted to do this in the interests of the employees at a time when there are still design options available. The better the numbers develop over the next few months, the more scope we have for this." The details are to be defined together with the works council.

### The Belated Filing of Form 4s with the SEC

---

[4]  The article can be found here: https://www.nw.de/lokal/kreis_paderborn/paderborn/21708958_US-Konzern-entlaesst-alle-120-Mitarbeiter-in-Paderborn.html; last accessed August 14, 2018.  The excerpt from the article is translated roughly to English.

214.     By March 2017, despite a denial of the claims set forth in the Pearson Exposé, certain of the Individual Defendants could no longer escape the fact that they each violated Section 16(a) of the Exchange Act by failing to file Form 3s and Form 4s with the SEC in a timely manner.

215.     On March 3, 2017, Defendant Dela Rama filed a Form 4 disclosing 12 separate transactions involving the disposal of Cemtrex stock which occurred between March 2015 and July 2016.

216.     On March 6, 2017, Defendant S. Govil filed a Form 4 disclosing eight separate Cemtrex stock transaction which occurred between February 2013 and February 2017.

217.     On March 7, 2017, Defendant Shah filed his initial statement of beneficial ownership on Form 3 and Form 4 and on March 7, 2017, Defendant Patel filed on Form 3 his initial statement of beneficial ownership.

### March 6, 2017 Unemon1 Blog Post

218.     On March 6, 2017, *Seeking Alpha* published an additional Unemon1 blog post which linked to Unemon1's own website, which reported on the March 2, 2017 *Neue Westfälische* article.  Unemon1 commented on the closure of the Paderborn facility in the context of Cemtrex's acquisition of Periscope GmbH and discussed the optimistic statements made by Cemtrex management in the past with regard to the acquisition of Periscope and the failure to publicly disclose news which had only been reported by the German media up to that point.

219.     On March 6, 2017, the price per share of Cemtrex stock fell $0.32, or 8.7%, from its closing price on March 3, 2017 (the previous trading day), closing at $3.35 per share.

## REPURCHASES

220.    The Company's Form 10-Q filed with the SEC on May 11, 2017 stated that "[d]uring the six-months ended March 31, 2017 the Company acquired and retired 363,528 shares of its common stock at a cost of $1,344,593 purchased under the share repurchase authorization that Cemtrex's board of directors approved . . . ."  Upon information and belief, at least part of these repurchases occurred while the price of the Company's stock was artificially inflated due to the stock promotion scheme and false and misleading statements described herein.

221.    Thus, the Company paid on average approximately $3.70 per share for the repurchases of its own stock.  As the stock was only worth $3.35 per share on March 6, 2017 when the truth fully emerged, the Company overpaid over $127,234 for repurchases of its own stock.

## DAMAGES TO CEMTREX

222.    As a direct and proximate result of the Individual Defendants' conduct, Cemtrex will lose and expend many millions of dollars.

223.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and Defendants S. Govil, A. Govil, and Dela Rama, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

224.    Such costs include at least a million dollars paid to the stock promotors, despite that the stock promotion scheme provided no benefit to the Company.

225.    Such costs also include, but are not limited to, unjust compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

226.    Such costs additionally include the approximately $127,234 Cemtrex overspent in repurchasing its own stock while the price of its common stock was artificially inflated as a result of the schemes discussed herein.

227.    As a direct and proximate result of the Individual Defendants' conduct, Cemtrex has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

228.    Plaintiff brings this action derivatively and for the benefit of Cemtrex to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors, officers and/or controlling shareholders of Cemtrex and unjust enrichment, as well as the aiding and abetting thereof.

229.    Cemtrex is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

230.    Plaintiff is, and at all relevant times has been, a Cemtrex shareholder.  Plaintiff will adequately and fairly represent the interests of Cemtrex in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

231.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

232.    A pre-suit demand on the Board of Cemtrex is futile and, therefore, excused.  At the time of filing of this action, the Board consists of the following five individuals: Defendants S. Govil, A. Govil, Panjwani, and Patel (collectively, the "Director-Defendants"), and non-party Metodi Filipov (together with the Director-Defendants, the "Directors").  Plaintiff only needs to

allege demand futility as to three of the five Directors that are on the Board at the time this action is commenced.

233.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to secretly pay fraudulent stock promoters and to make the false and misleading statements and omissions of material fact while at least two of them, *at least*, engaged in insider sales based on material non-public information, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

234.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in the scheme to manipulate the price and trading volume of Cemtrex's stock and to make and/or cause the Company to make the materially false and misleading statements alleged herein.  The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors.  While investors were duped into believing the fraud perpetrated by the Individual Defendants, according to the Pearson Exposé, three of the Individual Defendants, two of which are Directors, sold millions of dollars' worth of Company stock at artificially inflated prices based on inside material information.  As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

235.    Additional reasons that demand on Defendant S. Govil is futile follow.  Defendant S. Govil is the President, CEO of the Company and has served as Chairman of the Board since June 2014.  He received lavish compensation, including $490,000 in 2016.  Therefore, as the

Company admits, Defendant S. Govil is a non-independent Director.  His large Company stock holding, worth over $9.4 million on January 13, 2017, reveals his interest in keeping the Company's stock price as high as possible.  Defendant S. Govil was ultimately responsible for the Company and stock promoters' failures to disclose that the promotions were paid for by the Company.  He was also responsible for the Company's operations, internal controls, and all of the false and misleading statements and omissions that were made, including those contained in the SEC filings (he signed all the above Form 10-Qs and Form 10-Ks) and press releases (he personally commented in each of the press releases above).  As indicated by the Pearson Exposé, he made undisclosed, insider sales before the fraud was exposed, which demonstrate his motive in facilitating and participating in the fraud.  Defendant S. Govil is also a defendant in the Securities Class Action.  Additionally, Defendant S. Govil is beholden to, and controlled by, his father, Defendant A. Govil.  Lacking any prior experience, Defendant S. Govil had been placed by his father as head of the Company, earning hundreds of thousands of dollars of income since his appointment.  As a long-time Director, CEO and President, Defendant S. Govil conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the corrupt stock promotion scheme and scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Thus, for these reasons, too, Defendant S. Govil breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

236.     Additional reasons that demand on Defendant A. Govil is futile follow.  Defendant

A. Govil has served as a Director since December 2004 and is the Company's Executive Director.

As the Company admits, Defendant A. Govil is a non-independent Director.  His large Company

stock holding, worth over $20.9 million on January 13, 2017, reveals his interest in keeping the

Company's stock price as high as possible.  He headed the stock promotion scheme and was

ultimately responsible for the payments to SCS through Southern Steel.  Defendant A. Govil also

controls Ducon, which has engaged in related-party transactions with the Company, including a

current lessor-lessee relationship and the issuance of notes due to the Company.  His ownership of

66% of the Company's voting shares gives him control of Cemtrex.  Moreover, as controlling

shareholder, he has dominated the Board during the Relevant Period.  As indicated by the Pearson

Exposé, he made undisclosed, insider sales before the fraud was exposed, which demonstrate his

motive in facilitating and participating in the fraud.  Defendant A. Govil is also a defendant in the

Securities Class Action.  Furthermore, Defendant A. Govil's son, Defendant S. Govil, is CEO of

the Company and likely to face liability for the scheme outlined herein.  As a long-time Director

and current Executive Director, Defendant A. Govil conducted little, if any, oversight of the

Company's internal controls over public reporting of financial statements and of the Company's

engagement in the corrupt stock promotion scheme and scheme to make false and misleading

statements, consciously disregarded his duties to monitor such controls over reporting and

engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

Moreover, Defendant A. Govil was the maker of many of the false and misleading statements, as

he signed the 2012, 2013, 2015 and 2016 10-Ks.  Thus, for these reasons, too, Defendant A. Govil

breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

237.   Additional reasons that demand on Defendant Panjwani is futile follow.  Defendant Panjwani has served as a Director since April 2015 and is a member of the Audit Committee.  As a Director and member of the Audit Committee, Defendant Panjwani conducted little, if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the corrupt stock promotion scheme and scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Panjwani was the maker of many of the false and misleading statements, as he signed the 2015 and 2016 10-Ks.  Moreover, Defendant Panjwani is beholden to A. Govil and S. Govil, the controlling shareholders, who dominated the Board during the Relevant Period.  Thus, for these reasons, too, Defendant Panjwani breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

238.   Additional reasons that demand on Defendant Patel is futile follow.  Defendant Patel has served as a Director since April 2015 and is Chair of the Audit Committee.  He was appointed to these positions with no disclosed prior experience in running a public company, engineering, environmental controls or accounting issues, and therefore is not qualified to adequately assess a demand on the Board.  Additionally, Defendant Petal violated the Exchange Act by failing to file a Form 3 within ten (10) days of becoming a director and beneficial owner of the Company. As a Director and Chair of the Audit Committee, Defendant Patel conducted little,

if any, oversight of the Company's internal controls over public reporting of financial statements and of the Company's engagement in the corrupt stock promotion scheme and scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls (he was awarded shares by the Company and failed to disclose his new shareholdings in violation of federal securities laws) over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Defendant Patel was the maker of many of the false and misleading statements, as he signed the 2015 and 2016 10-Ks.  Moreover, Defendant Patel is beholden to A. Govil and S. Govil, the controlling shareholders, who dominated the Board during the Relevant Period.  Thus, for these reasons, too, Defendant Patel breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

239.    Additional reasons that demand on the Board is futile follow.

240.    The demand in this case is excused because the Directors, four of whom are named defendants in this action, are beholden to and controlled by Defendants A. Govil and S. Govil who together beneficially owned 73.1% of the Company's voting stock as of January 13, 2017.[5]  As the Company itself notes in the 2016 10-K (and in its Form 10-K/A filed with the SEC on January 29, 2018) it is a "Controlled Company" under exchange listing rules.  Cemtrex also notes that: "the Company's management controls and will control in the future, substantially all matters requiring approval by the stockholders of the Company, including the election of all directors and approval of significant corporate transactions. This makes it impossible for the public stockholders to influence the affairs of the Company."  Therefore, demand in this case is futile, and excused.

---

[5] Per the Company's Form 10-K/A filed with the SEC on January 29, 2018, as of January 26, 2018, Defendants A. Govil and S. Govil together beneficially owned 61.9% of the Company's voting stock.

241.    The Director-Defendants, as members of the Board, were and are subject to the Code of Ethics.  The Code of Ethics goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations.  The Code of Ethics requires the Director-Defendants to also adhere to Cemtrex's standards of business conduct.  The Director-Defendants did not comply with the requirements of the Code of Ethics.  The Director-Defendants violated the Code of Ethics because they knowingly or recklessly participated in causing the Company to engage in the stock promotion scheme and make the materially false and misleading statements alleged herein. Because the Director-Defendants violated the Code of Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

242.    The Directors have longstanding business, personal, and even familial relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders.  These relationships include the father-son relationship between Defendants A. Govil and S. Govil and the personal relationship between Defendants Patel and Shah, who attended New York University's Stern School of Business together.  Moreover, non-party Metodi Filipov formerly served as the Company's Vice President of Operations from 2008 to 2010, during which time Defendant A. Govil, who then owned 65% of the Company's common stock, was effectively Mr. Filipov's boss.  These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.  Thus, any demand on the Directors would be futile.

243.    Cemtrex has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves

or others who were responsible for that wrongful conduct to attempt to recover for Cemtrex any part of the damages Cemtrex suffered, and will continue to suffer, thereby.  Thus, any demand on the Directors would be futile.

244.   The Individual Defendants' conduct described herein and summarized above, including the Board's approval of the Company's repurchases of Company stock at artificially inflated prices, could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).  As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

245.   The acts complained of herein constitute violations of fiduciary duties owed by Cemtrex's officers and directors, and these acts are incapable of ratification.

246.   The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Cemtrex.  If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the

Directors were to sue themselves or certain of the officers of Cemtrex, there would be no directors'

and officers' insurance protection.  Accordingly, the Director-Defendants cannot be expected to

bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought,

such insurance coverage, if such an insurance policy exists, will provide a basis for the Company

to effectuate a recovery.  Thus, demand on the Director-Defendants is futile and, therefore,

excused.

247.    If there is no directors' and officers' liability insurance, then the Director-

Defendants will not cause Cemtrex to sue the Individual Defendants named herein, since, if they

did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that

event, as well.

248.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of

them, at least three of them, cannot consider a demand with disinterestedness and independence.

Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against Individual Defendants for Violations of**
### **Section 14(a) of the Securities Exchange Act of 1934**

249.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth

above, as though fully set forth herein.

250.    The Section 14(a) Exchange Act claims alleged herein are based solely on

negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf

of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not

sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of,

or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

251.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

252.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

253.    Under the direction and watch of the Directors, the 2014 Proxy Statement failed to disclose that: (1) the Individual Defendants caused Cemtrex to falsely state the stock ownership totals of its insiders in the Company's SEC filings; (2) Defendants A. Govil, S. Govil, and Dela Rama engaged in lucrative undisclosed insider sales; (3) Defendants A. Govil, S. Govil, Dela Rama, Panjwani, Patel, and Shah failed to meet mandatory reporting requirements under Section 16(a) of the Exchange Act; and (4) the Company failed to maintain adequate internal controls.

254.    Under the direction and watch of the Directors, the 2016 and 2017 Proxy Statements failed to disclose that the Individual Defendants: (1) engaged in a scheme to manipulate

the price and trading volume of Cemtrex's stock by paying stock promoters to disseminate false and misleading articles and promotions concerning the Company; (2) caused the Company to conceal that the Company paid stock promoters through an undisclosed entity owned by A. Govil; (3) caused Cemtrex to falsely state the stock ownership totals of its insiders in the Company's SEC filings; (4) exchanged debt instruments for additional Cemtrex securities, further entrenching Defendant A. Govil's control over the Company; (5) caused the Company to claim to own an Indian subsidiary that it did not actually have ownership of; (6) caused the Company to tout the financial outlook for the automotive electronics sector and Cemtrex's opportunity to capitalize on the expected growth in that sector, despite Cemtrex's poor performance in that sector, which led to a decision to shut down a recently acquired automotive electronics manufacturing plant in Germany; (7) caused the Company to fail to maintain adequate internal controls by, *inter alia*, using a fraudulent Company auditor that was signing off on the Company's financial disclosures without conducting a proper review.

255. Moreover, the 2016 Proxy Statement failed to disclose that: (1) Defendants A. Govil, S. Govil, and Dela Rama engaged in lucrative undisclosed insider sales; and (2) Defendants A. Govil, S. Govil, Dela Rama, Panjwani, Patel, and Shah failed to meet mandatory reporting requirements under Section 16(a) of the Exchange Act. The 2017 Proxy Statement failed to disclose that: (1) Defendants A. Govil, S. Govil, and Dela Rama engaged in lucrative undisclosed insider sales; and (2) Defendants A. Govil and Dela Rama failed to meet mandatory reporting requirements under Section 16(a) of the Exchange Act.

256.    Moreover, the 2014, 2016, and 2017 Proxy Statements were false and misleading when it discussed the Company's adherence to specific governance policies and procedures, including the Code of Ethics, due to the Individual Defendants' failures to abide by them.

257.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2014, 2016, and 2017 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2014, 2016, and 2017 Proxy Statements, including, but not limited to, election of directors, approval of officer compensation, and appointment of an independent auditor.

258.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions of material fact in the 2014, 2016, and 2017 Proxy Statements.

## SECOND CLAIM

### Against Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

259.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

260.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Cemtrex. Not only is Cemtrex now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Cemtrex by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to

repurchase over $1.3 million of its own shares on the open market at artificially-inflated prices, damaging Cemtrex by over one hundred and twenty thousand dollars.

261.   During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

262.   The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material facts and omitting to state material facts necessary in order to make the statements made about Cemtrex not misleading.

263.   The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Cemtrex. The Individual Defendants acted with scienter, in that they either had actual knowledge of the schemes and the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and

omissions of material fact disseminated to the public through press releases, conference calls, and filings with the SEC.

264.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were each serving as a senior executive and/or director of the Company, as members of the Board, each of the Individual Defendants then serving as a director signed certain of the Company's false and misleading SEC filings, including the Form 10-K's noted herein.

265.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

266.    Plaintiff, on behalf of Cemtrex, has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

267.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

268.    The Individual Defendants, by virtue of their positions with Cemtrex and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Cemtrex and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Cemtrex to engage in the illegal conduct and practices complained of herein.

269.    Plaintiff, on behalf of Cemtrex, has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

270.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

271.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Cemtrex's business and affairs.

272.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

273.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Cemtrex.

274.     In breach of their fiduciary duties owed to Cemtrex, the Individual Defendants: (1) engaged in a scheme to manipulate the price and trading volume of Cemtrex's stock by paying stock promoters to disseminate false and misleading articles and promotions concerning the Company; (2) caused the Company to conceal that the Company paid stock promoters through an undisclosed entity owned by A. Govil; (3) caused Cemtrex to falsely state the stock ownership totals of its insiders in the Company's SEC filings; (4) exchanged debt instruments for additional Cemtrex securities, further entrenching Defendant A. Govil's control over the Company; (5) caused the Company to claim to own an Indian subsidiary that it did not actually have ownership of; (6) caused the Company to tout the financial outlook for the automotive electronics sector and Cemtrex's opportunity to capitalize on the expected growth in that sector, despite Cemtrex's poor

- 103 -

performance in that sector, which led to a decision to shut down a recently acquired automotive electronics manufacturing plant in Germany; (7) caused the Company to fail to maintain adequate internal controls by, *inter alia*, using a fraudulent Company auditor that was signing off on the Company's financial disclosures without conducting a proper review; and (8) made and/or caused the Company to make false and misleading statements and omissions of material fact regarding the above schemes and the Company's lack of adequate internal and financial controls.

275.    Moreover, in breach of their fiduciary duties: (1) Defendants A. Govil, S. Govil, and Dela Rama engaged in lucrative undisclosed insider sales; (2) Defendants A. Govil, S. Govil, Dela Rama, Panjwani, Patel, and Shah failed to meet mandatory reporting requirements under Section 16(a) of the Exchange Act; and (3) the Individual Defendants made false and misleading statements regarding such conduct.

276.    The Individual Defendants also failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

277.    The Individual Defendants additionally breached their fiduciary duties by causing the Company to spend over $1.3 million for repurchases of its own stock at artificially inflated prices.

278.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements and they failed to correct the Company's public statements.  The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

Such material misrepresentations and omissions of material fact were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Cemtrex's securities and disguising insider sales.

279.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly.

280.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

281.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Cemtrex has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

282.     Plaintiff on behalf of Cemtrex has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

283.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

284.   By their wrongful acts and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Cemtrex.

285.   The Individual Defendants either benefitted financially from the improper conduct, related party transactions, and their making lucrative insider sales tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Cemtrex that was tied to the performance or artificially inflated valuation of Cemtrex, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

286.   Plaintiff, as a shareholder and a representative of Cemtrex, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits -- including from insider sales, related party transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

287.   Plaintiff on behalf of Cemtrex has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Abuse of Control

288.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

289.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Cemtrex, for which they are legally responsible.

290.   As a direct and proximate result of the Individual Defendants' abuse of control, Cemtrex has sustained significant damages.  As a direct and proximate result of the Individual

Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Cemtrex has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

291.    Plaintiff on behalf of Cemtrex has no adequate remedy at law.

## SEVENTH CLAIM

### Against Individual Defendants for Gross Mismanagement

292.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

293.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Cemtrex in a manner consistent with the operations of a publicly-held corporation.

294.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Cemtrex has sustained and will continue to sustain significant damages.

295.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

296.    Plaintiff, on behalf of Cemtrex, has no adequate remedy at law.

## EIGHTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

297.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

298.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, defendants have caused Cemtrex to waste valuable corporate assets and to incur many millions of dollars of legal liability and costs to defend unlawful actions.

299.    The Company also wasted corporate assets in repurchasing its own stock at artificially inflated prices and in furtherance of their stock promotion scheme by indirectly paying the fraudulent stock promoters to disseminate promotions that violated the federal securities laws in touting Cemtrex.

300.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

301.    Plaintiff on behalf of Cemtrex has no adequate remedy at law.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Cemtrex, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that each of the Individual Defendants breached or aided and abetted the breach of their fiduciary duties to Cemtrex;

(c)    Determining and awarding to Cemtrex the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Cemtrex and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with

applicable laws and to protect Cemtrex and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

      1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

      2.  a provision to permit the shareholders of Cemtrex to nominate at least three candidates for election to the Board; and

      3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

      (e)    Awarding Cemtrex restitution from Individual Defendants, and each of them;

      (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

      (g)    Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

    Plaintiff hereby demands a trial by jury.

Dated: August 15, 2018            Respectfully submitted,

                **THE ROSEN LAW FIRM, P.A.**

                /s/ Phillip Kim
                Phillip Kim
                275 Madison Avenue, 34th Floor
                New York, New York 10016

Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

*Counsel for Plaintiff*

DocuSign Envelope ID: 321ACEA0-48F9-4E50-B9B6-608B2D725040

## VERIFICATION

I, Matthias Scharf  am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _ th day of August 2018.

13.08.2018 12:40:09 PDT

DocuSigned by:

CF36BE8FFEB6464

Matthias Scharf